**UNITED STATES v. LOCAL 36 OF INTER-
NATIONAL, FISHERMEN & ALLIED
WORKERS et al.**

No. 18842.

District Court, S. D. California, C. D.

March 12, 1947.

James M. Carter, U. S. Atty., and Howard V. Calverley, both of Los Angeles, Cal., William C. Dixon and Robert J. Rubin, Sp. Assts. to Atty Gen., and Benjamin F. Schwartz and Jesse R. O'Malley, Sp. Attys., Anti-trust Division, both of Los Angeles, Cal., for plaintiff.

Katz, Gallagher & Margolis and Ben Margolis, all of Los Angeles, Cal., Gladstein, Andersen, Resner, Sawyer & Edises and George Andersen, all of San Francisco, Cal., and Robert W. Kenny of Los Angeles, Cal., for all defendants except Sherman.

Arthur Garrett, of Los Angeles, Cal., for defendant Sherman.

HALL, District Judge.

The defendants' motion to dismiss the indictment and their challenge and motion to strike out the entire trial jury panel are both based upon the same grounds. In view of the fact that the February 1946 grand jury which returned the indictment and the current trial jury panel were chosen from the names selected in the same method and manner by the jury commissioner and the clerk, the stipulation that the two motions might be heard together was approved.

Briefly stated, the contention is that the grand jury for the February 1946 term and the present trial jury panel were drawn in such manner that the grand jury was "not an impartial grand jury" and that the trial jury panel was not "an impartial jury panel drawn from a cross-section of the community, but that certain defined groups of the community, to wit: laborers, people working by the day or hour, members of labor unions and Negroes were systematically and intentionally discriminated against, and were excluded from the list of persons to serve" as grand jurors and trial jurors. It is further asserted that they were deprived of their right to an impartial grand jury and an impartial trial jury "without such exclusion and discrimination as against groups and classes of persons to which defendants belong."

While it might appear from the wording of the motion and the affidavit of one of the counsel filed in support of the motion that there was a willful and deliberate intent on the part of the clerk and the jury commissioner to effect such an alleged discrimination, it should be stated at this point that after the conclusion of the evidence and during the course of the argument Mr. Margolis, of defendants' counsel, stated that the defendants did not want anything in the argument or in the presentation of the evidence to indicate that they intended to impugn the motives or the desires of either Mr. Brown, the commissioner, or Mr. Smith, the clerk, and that there is nothing in the record which shows anything from the standpoint of personal motivation of either of them.·

Be it also said that counsel for the defendants, in support of their motion, instead of limiting their tactics to merely an attack upon the methods used, have very commendably sought to produce by evidence and in argument suggestions which were calculated to aid the officials of this court charged with the very difficult task of selecting jurors, to find a better way than the one under assault.

It should also be stated that this is not a usual proceeding. So far as I can ascertain from the records of this court, of which I take judicial notice, only twice before has a challenge recently on somewhat the same grounds been made, once in 1924 and once in 1939. From the records it appears

that upon each of these occasions the motions were denied and no appeal taken. Such proceedings were, however, before the series of cases recently promulgated by the Supreme Court beginning with the case of Smith v. Texas, 1940, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84; Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L. Ed. 680; Hill v. Texas, 1942, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559, and its companion case Akins v. Texas, 1945, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692, and culminating with Thiel v. Southern Pacific, 1946, 328 U.S. 217, 66 S.Ct. 984 and Ballard v. United States, 1946, 329 U.S. 187, 67 S. Ct. 261, 91 L.Ed. ——.

The defendants contend that it is the rationale of those cases, not only that the deliberate and intentional exclusion by a clerk or the jury commissioner of persons having common characteristics by virtue of their employment, or their method or time or rate of pay, or religion, race, politics, geographic location, or associations in social intercourse, is unlawful, but also that the use of a method or system of selection which, without intention so to do on the part of either of those officers, results in the exclusion of any such group having common characteristics is likewise unlawful.

They further contend that the use of any method, process or system of selection which results in the over-weighting, by a larger percentage of one occupation than another among the actual jurors selected, of persons from one group or "class" is likewise unlawful. The latter contention is more clear if it is stated specifically. It is, that an "economic class" (arbitrarily designated by the defendants as proprietors, managers and officials) constitute more than 50 per cent of the grand jury and the trial jury panel under attack, whereas this so-called "economic class" actually constitutes but approximately 15 per cent of the population.

Any discussion of this problem necessarily begins with the *Thiel* case, supra, which has been much discussed not only among the members of the bar but it is a matter of particular interest to the trial judge. In this connection, reference is made to the address by the Hon. Louis E. Goodman, United States District Judge, to the September 1946 Conference of Judges of the Ninth Circuit (6 F.R.D. 253), and to Judge Harris' opinion in the *Thiel* case on its remand (67 F.Supp. 934).

The difficulty in this proceeding has been to interpret and apply the statements, conclusions and apparent holdings of the majority opinion of the Supreme Court in the *Thiel* case to the practical realities with which the lower courts are confronted in the actual trial of lawsuits.

It is arguable that the majority opinion in the *Thiel* case [328 U.S. 217, 66 S. Ct. 987], in addition to deciding specifically that the act of the clerk and the jury commissioner was unlawful in "intentionally and systematically" excluding men who were paid by the day, also established several other very broad and far-reaching propositions, which may be generally stated as follows:

1. That people who are paid at different times, that is, by the day, or hour, or week or month, or by the piece or otherwise, are in different "economic classes" than those paid differently, regardless of the similarity of their work, personality, background, experience, education, sex, race, religion, politics or other common characteristics.[1]

2. That women must be regarded as being in a separate economic "class" from their husbands, regardless of work, personality, background, experience, education, race, religion, politics or other common characteristics.[2]

3. That persons of the opposite sex, and persons who are in one "economic class," as a matter of law, without regard

---

[1] In this connection, it may be noted that it is arguable that that is the whole tenor of the opinion; and the statement therein is particularly noted that "laborers who were paid weekly or monthly wages were placed on the jury lists,"; and the analysis of the majority opinion by Justice Frankfurter in his dissent is also noted in this connection.

[2] In this connection, the whole opinion and Justice Frankfurter's analysis of it in his dissent is noted, and particularly the fact that the jury lists contained "the wives of daily wage earners."

to the facts concerning an actual state of mind, are to be regarded as being incapable of being "impartial" to a litigant who is not of the same sex or in the same economic group or class, regardless of similarity of work, background, experience, personality, education, race, religion, politics or other common characteristics.[3]

4. That, if the foregoing three propositions are established by the majority opinion, then the clerk and jury commissioner are charged with the necessity of stratifying a community into "classes," with relation to their social affiliations, sex, religion, race, political affiliation, geographic location, economic status and occupation, and rate and time or method of payment for work done, in order that they may be sure not to devise a system which may exclude persons of a particular class.

While these propositions are not couched in the language used by the defendants in their motions, and are not a complete statement of all their points, they are nevertheless implicit to the legal position which they have taken in making the motions, and it is necessary that these propositions be stated and examined before proceeding further. The *Thiel* case either marks a fundamental change in what is meant by the right to a trial by an "impartial" jury as guaranteed by the Sixth Amendment or it is but an application of established principles to the conduct of officials charged in the Federal Courts with the difficult task of selecting jury lists.

It should be stated at this point that the subsequent decision in the Ballard case on December 9, 1946 (supra) does not aid in the application and interpretation of the *Thiel* case. In the first place, the majority opinion in the Ballard case, by quoting with approval a portion of the dissenting opinion of Judge Denman in the same case in the Circuit Court which suggested that a woman on the jury could "rationalize" the conduct of the defendant Mrs. Ballard, and the further statement in the Supreme Court [329 U.S. 195, 67 S.Ct. 265] majority opinion that such quotation "illustrates

that the exclusion of women from jury panels may at times be highly prejudicial to the defendants," leaves a suggestion, without a definite holding to the effect, that a woman religionist (i. e. a class within a class) suffers actual prejudice amounting to a denial of a constitutional right to an "impartial" jury if women religionists (i. e. a class of occupation within the broader class of the same sex) did not actually sit on both the grand jury and the trial jury.

In the second place, the majority opinion in the Ballard case indicated that the jury was selected contrary to what was referred to as "prescribed standards" of jury selection, and also speaks of a "departure from the statutory scheme," with no reference whatever to any statute, rule or decision where those "standards" are "prescribed," or where any "scheme" much less "the statutory scheme" for picking a jury which is "a cross-section of the community and truly representative" is set forth, or referred to, or can be found. The need of such standards and such scheme, or the impossibility of devising one which can be frozen into the language of a statute or rule, is emphasized by the fact that the defendants are challenging the panels in this case on the ground, among others, that it does not appear the lists contained any persons who were paid by the hour.

It is not inappropriate to note in this connection that the new Federal Rules of Criminal Procedure, 18 U.S.C.A. following section 687, were promulgated by the Supreme Court several years after their decision in the Glasser case (supra January 19, 1942) which indicated an awareness of the lack of any statutory scheme or prescribed standards in the Federal Courts, but that the new Rules of Criminal Procedure are entirely silent on the subject.

It is also not inappropriate to note that several years before the promulgation of the Rules of Criminal Procedure the Supreme Court in the McNabb case, 1943, 318 U.S. 332, 63 S.Ct. 608, 613, 87 L.Ed. 819 asserted for the first time its "supervisory authority over the administration of crim-

---

[3] In this connection, it is to be noted that the constitutional right is to an "impartial" jury, and economic or other class or status is material only as it goes to aid in securing such "impartial" jury.

786

inal justice in the federal courts" in procedural matters without a previously promulgated rule or statute governing such procedure to guide the lower courts in the first instance.

However cogently it may be asserted that the four arguable propositions above set forth must be spelled out of the majority opinion in the *Thiel* case, I feel that I must reject them. To accept them as binding authority upon the trial courts of the United States would be to attribute to the Supreme Court an intention, not only to create classes and set one against the other, but actually in the administration of justice to create such confusion and chaos as to make it impossible for any clerk or jury commissioner, or a trial judge sitting in review of their action, to devise a method for the selection of jurors which would not be the subject of subsequent successful attack. To accede to these arguable contentions as to the holdings of that case, in addition to the chaos in the enforcement of criminal statutes as well as in the adjudication of civil rights, would be to eliminate all finality to any judgment depending upon the verdict of a jury or an indictment by a grand jury until the Supreme Court determined in each case whether or not the particular method or process of selecting jury panels for each jury excluded, or resulted in the exclusion of, what the Supreme Court might conclude at that particular moment of decision was a separate, economic, religious, racial, social, political or geographic "class" of persons.

These arguable conclusions must be further rejected for the reason that the Supreme Court based their decision in the case, not upon the ground that there was any substantial prejudice to the appellant —and in this connection the harmless error statute was in the following months in the Kotteakos case, 328 U.S. 750, 66 S.Ct. 1239, reaffirmed by the Supreme Court, not only in principle but actually in effect—nor did they base their ruling upon a holding that any rule of court or statute had been abridged or violated by either the clerk or the jury commissioner or the court, nor upon the holding that any constitutional right was infringed, nor any constitutional question involved, but upon what they re-

ferred to as their "power of supervision over the administration of justice in the Federal Courts," without reference to any statute or constitutional provision which states or outlines such a power, so that lower court officials in selecting juries could have recourse to such a statutory source of power to determine if such a statute would furnish some guide in the classification of the various groups in the communities or methods for selecting jurors.

■ Moreover, to so hold would be against at least the rationale of the decision of the *Thiel* case which reversed the lower court's holding on the ground that it was in violation of "the American tradition of trial by jury." And certainly the American tradition of trial by jury, as well as all other American traditions, are based upon the proposition that under the law all effort shall be made to eliminate distinctions and discriminations between any possible groups and prevent the formation of one "class" or more to set itself or themselves against any other "class." We are still dedicated to the proposition that "all men are created equal" as a self-evident truth.

Another reason why these arguable conclusions cannot be sustained is that the Thiel case must be interpreted and applied not alone in California, the state of its origin, but also in all of the other 47 states, each of which has constitutionally prescribed its own set of standards of qualification, competency and exemption for jury service, which must be followed by the Federal Courts sitting in those several states, under the mandate of Section 411 of Title 28 U.S.C.A.

And finally these arguable conclusions must be rejected as the holding of the Supreme Court in the *Thiel* case because of their impossibility of application to the actualities of life, as illustrated in our attempt to apply them in this case. How can a clerk or jury commissioner or judge of a lower court in reviewing the acts of these officials know whether or not any "economic" or other group is included or excluded until they know, or have a way of knowing from some statute, into what economic or other classes the community is or should or can be divided? The only statutory norms at

present are those which relate to political affiliations, geographic location, race, color or previous condition of servitude, as set forth in Sections 412, 413 and 415 respectively of Title 28 U.S.C.A.

In this connection, the defendants engaged the services of an assistant professor of sociology and statistics who, with people working under his direction, undertook an analysis and a breakdown into different "economic classes" of the grand and petit jury panels beginning with the February 1946 grand jury (which returned the indictment in this case) and continuing through the names of the jurors who were placed in the master jury box of the court for the term of the current grand and petit juries. The study involved an examination of all available questionnaires (about 1,100), supplemented by information obtained from the city directory, voters' register and by personal telephone calls. The professor was called as an expert witness and testified at length. No effort was made by the witness (or otherwise by the defendants) to classify any of the members of any of the jury panels according to their racial, religious, social, sex, political or geographic status or characteristics, and the defendants, by the expert's testimony and otherwise, limited their evidence to an attempted classification by "economic" classes, or groups.

The classification of "economic" groups used by the witness was limited solely to the classification of employed persons used by the Census Bureau of the United States for the 1940 census, which is Tables 13 and 16 of the pamphlet entitled "The Labor Force for California 1940 Census." These tables apply only to "employed persons" and list 167 occupations for employed males and 77 occupations for employed females. The witness used only the tables as applicable to males, and in his analyses placed all the females on the jury panels in the same occupational classification as their husbands, unless the questionnaire indicated a different one. This was done on the basis of his conclusions that wives generally had the same outlook and viewpoint as their husbands.

The 167 occupational classifications of the Census Bureau are reduced to 12 broad general classifications, and the witness in his analysis places all the persons in the panels in one or the other of these 12 classifications. As against those 167 occupational classifications, the "Dictionary of Occupations," an official publication of the Department of Labor (1939 Edition) lists 29,000 occupations, of which 7,000 occupations are broken into 12 very general broad classifications which follow somewhat the pattern, but actually differ from, the 12 classifications used in the Census Bureau. No data is available of which judicial notice can be taken, and no evidence was offered as to the classification or breakdown of employed persons into the method or time of payment for their work, whether by the hour, by the day, by the week, by the month or by the piece. One of the grounds of challenge by the defendants, as heretofore indicated, is that persons paid by the hour were excluded from the grand jury. Moreover, as against the 167 classifications of occupations used by the witness, I examined about 350 of the questionnaires in evidence at random and listed about 250 different occupations stated by the jurors themselves on their questionnaires.

The 12 general classes of the 1940 census which the witness used, breaks the population as follows:

Under the heading "Professional and Semi-professional Workers" there are 26 occupations listed.

Under the heading "Farmers and Farm Managers" there is one occupation listed.

Under the heading "Proprietors, Managers and Officials, Except Farm," there are 15 occupations listed.

Under the heading "Clerical, Sales and Kindred Workers," there are 17 occupations listed.

Under the heading "Craftsmen, Foremen and Kindred Workers," there are 28 occupations listed.

Under the heading "Operatives and Kindred Workers," there are 38 occupations listed.

Under the heading "Domestic Service Workers" there is one occupation listed.

Under the heading "Farm Laborers" there is one occupation only listed.

Under the heading "Protective Service Workers" there are four occupations listed.

Under the heading "Service Workers, Except Domestic and Protective" there are 10 occupations listed.

Under the heading "Laborers, Except Farm and Mine" there are 26 occupations listed.

It is to be observed, and it is important in the analysis of the testimony, that of the 12 categories only "Domestic Service Workers" and "Farm Laborers" are limited to one occupation except for the category "Farmers and Farm Managers." All the others list numerous occupations.[4]

---

[4] The reporter will copy in the record at this point so that my remarks will be complete the Census classification of occupations as shown by Exhibit W-2.

A. Professional and Semi-Professional Workers
  1. Actors
  2. Architects
  3. Artists and art teachers
  4. Authors, editors and reporters
  5. Chemists, assayers, and metallurgists
  6. Clergymen
  7. College presidents, professors and instructors
  8. Dentists
  9. Civil engineers
  10. Electrical engineers
  11. Mechanical engineers
  12. Other technical engineers
  13. Lawyers and judges
  14. Musicians and music teachers
  15. Osteopaths
  16. Pharmacists
  17. Physicians and surgeons
  18. Social and welfare workers
  19. Teachers (n. e. c.) (including county agents)
  20. Trained nurses and student nurses
  21. Veterinarians
  22. Other professional workers
  23. Dancers, showmen and athletes
  24. Designers and draftsmen
  25. Surveyors
  26. Other semi-professional workers

B. Farmers and Farm Managers

C. Proprietors, Managers, and Officials, exc. farm
  1. Conductors, railroad
  2. Postmaster, and misc. government officials
  3. Other specified managers and officials
  4. Props., mgr., and officials (n. e. c.) by industry:
    a. Mining
    b. Construction
    c. Manufacturing
    d. Transportation, communication and utilities
    e. Wholesale trade
    f. Eating and drinking places
    g. Retail trade, exc. eating and drinking places
    h. Finance, insurance and real estate
    i. Business and repair services
    j. Personal services
    k. Miscellaneous industries and services

D. Clerical, Sales and Kindred Workers
  1. Baggagemen, express messengers and ry. mail clerks
  2. Bookkeepers, accountants, cashiers, and ticket agents
  3. Mail carriers
  4. Messengers, except express
  5. Office machine operators
  6. Shipping and receiving clerks
  7. Stenographers, typists and secretaries
  8. Telegraph operators
  9. Telephone operators
  10. Other clerical and kindred workers
  11. Canvassers and solicitors
  12. Hucksters and peddlers
  13. Newsboys
  14. Insurance agents and brokers
  15. Real estate agents and brokers
  16. Other sales agents and brokers
  17. Other salesmen

E. Craftsmen, Foremen and Kindred Workers
  1. Bakers
  2. Blacksmiths, forgemen and hammermen
  3. Boilermakers
  4. Cabinetmakers and pattern makers
  5. Carpenters
  6. Compositors and typesetters
  7. Electricians
  8. Inspectors (n. e. c.: most inspectors in mfg. are classified as operatives)
  9. Locomotive engineers
  10. Locomotive firemen
  11. Machinists, millwrights and tool makers
  12. Masons, tile setters and stonecutters
  13. Mechanics and repairmen, and loom fixers
  14. Molders, metal
  15. Painters (construction, paperhangers, and glaziers
  16. Plasterers and cement finishers
  17. Plumbers and gas and steam fitters
  18. Printing craftsmen, exc. compositors and typesetters
  19. Rollers and roll hands, metal
  20. Roofers and sheet metal workers
  21. Shoemakers and repairers (not in factory)
  22. Stationary engineers, cranemen, and hoistmen
  23. Tailors and furriers
  24. Other craftsmen and kindred workers
  25. Foremen
    a. Construction
    b. Manufacturing
    c. Transportation
    d. Miscellaneous

To accept this breakdown as a reasonable classification as to economic status would compel the conclusion that everybody listed under "A", for example, "Professional and Semi-professional Workers," had the same viewpoint and mental attitude towards life

F. Operatives and Kindred Workers
1. Apprentices
2. Attendants, filling station, parking lot and airport
3. Brakemen and switchmen, railroad
4. Chauffeurs, truck drivers and delivery-men
5. Conductors, bus and street railway
6. Dressmakers and seamstresses (not in factory)
7. Firemen, except locomotive and fire department
8. Laundry operatives and laundresses, exc. priv. family
9. Linemen and servicemen, telegraph, telephone, power
10. Mine operatives and laborers
11. Motormen, railway, mine, factory, etc.
12. Painters, except construction and maintenance
13. Power station operators
14. Sailors and deck hands, except U. S. Navy
15. Welders and flame-cutters
16. Other specified operatives and kindred workers
17. Operatives and kindred workers (n. e. c.) by industry:
    a. Manufacturing
       Food and kindred products
       Tobacco manufacturers
       Cotton manufacturers
       Silk and rayon manufacturers
       Woolen and worsted manufacturers
       Knit goods
       Other textile-mill products
       Apparel and other fabricated textile products
       Lumber, furniture and lumber products
       Paper, paper products, and printing
       Chemicals, and petroleum and coal products
       Rubber products
       Footwear industries, except rubber
       Leather and leather products, except footwear
       Stone, clay, and glass products
       Iron and steel and not spec. metal industries
       Nonferrous metals and their products
       Machinery
       Automobiles and automobile equipment
       Transportation equipment, except automobile
       Other manufacturing industries
    b. Nonmanufacturing industries and services

G. Domestic Service Workers
H. Protective Service Workers
1. Firemen, fire department
2. Guards and watchmen
3. Policemen, sheriffs and marshals
4. Soldiers, sailors, marines and coast guards (Excludes commissioned officers, professional and clerical workers, and craftsmen)
I. Service Workers, Except Domestic and Protective
1. Barbers, beauticians and manicurists
2. Boarding house and lodging house keepers
3. Charwomen, janitors and porters
4. Cooks, except private family
5. Elevator operators
6. Housekeepers, stewards, hostesses, exc. priv. family
7. Practical nurses and midwives
8. Servants, except private family
9. Waiters and bartenders
10. Other service workers, exc. domestic and protective
J. Farm Laborers
K. Laborers, Except Farm and Mine
1. Fishermen and oystermen
2. Longshoremen and stevedores
3. Lumbermen, raftsmen and woodchoppers
4. Other specified laborers
5. Laborers (n. e. c.) by industry:
6. Construction
7. Manufacturing
   a. Food and kindred products
   b. Textiles, textile products and apparel
   c. Lumber, furniture and lumber products
   d. Paper, paper products and printing
   e. Chemicals, and petroleum and coal products
   f. Leather and leather products
   g. Stone, clay and glass products
   h. Iron and steel and not spec. metal industries
   i. Nonferrous metals and their products
   j. Machinery
   k. Automobiles and automobile equipment
   l. Transportation equipment, except automobile
   m. Other manufacturing industries
8. Nonmanufacturing
   a. Railroads (including railroad repair shops)
   b. Transportation, except railroads
   c. Communication and utilities
   d. Wholesale and retail trade
   e. Personal services
   f. Other nonmanufacturing industries and services

as every other one. It would compel the Court to say that a dancer (a chorus girl on Main Street perhaps) had the same viewpoint and mental attitude towards life as a clergyman, regardless of race, religion, education, personality, background or geographic location. Or that a student nurse, working for a pittance, is in the same, "economic class," as an actress making tens if not hundreds of thousands of dollars a year. And the same is true of all the other 26 occupations listed under the first heading, where the only thing in common under that heading is that they have had specialized training in widely divergent fields for their particular occupation.

The impossibility of applying this breakdown as a reasonable and rational one for other than census purposes is illustrated upon examination of all the subheads and occupations listed. It would require the Court to place a railroad conductor in the same economic group or "class" as the millionaire owner of a national chain of newspapers, for instance, or as the millionaire owner of a large oil company, or as a banker or one who owned vast quantities of rental properties. It would belabor the point to continue the comparisons, and the foregoing is sufficient to demonstrate that the occupational classifications used by the witness are completely inappropriate to determine what is a truly representative cross-section of the community with relation to any so-called "economic class."

It is equally sufficient to demonstrate that any other effort to stratify the community into "economic classes" in order to ascertain whether or not any economic class has been excluded, would result in the same kind of a legal cul-de-sac. It is also sufficient to demonstrate that the *Thiel* case, and the Ballard case as well for that matter, required and intended no such far-fetched conclusions or legal consequences.

I must and do, therefore, conclude that the *Thiel* case is limited in its holding to the proposition (1) that for a jury panel to be invalid because of discrimination there must be clear evidence of an intent on the part of the jury commissioner or the clerk, or both, to prevent or exclude, or to devise and use a system or method of selection which is calculated and intended by them, or either of them, to result in the prevention or exclusion of, any person or group of persons from being called for jury service on account of, and solely because of, either their economic status, occupation, rate or time or method of pay, race, sex, religion, social affiliation or lack of it, political affiliation, or the location of their homes geographically in the community, and that (2) in California the power to grant exemptions and excuses is a judicial power within the exclusive province of the judge, and any usurpation of that power by the clerk or jury commissioner is unlawful.[5]

By such a construction of the *Thiel* case it is not only possible to apply it in the actual trial of lawsuits, but no radical departure is made from previous holdings of the Supreme Court on similar questions, and as I read the *Thiel* case, no radical departure was intended to be made. In examining these cases it is found that in those which involved exclusion of Negroes from grand or petit juries in state courts in violation of the equal protection clause of the Fourteenth Amendment, the Supreme Court pointed out that a statute either specifically excluded Negroes or, if the statute permitted Negroes, it was so administered as to amount to a systematic and intentional exclusion of Negroes by those charged with selecting juries.

In Strauder v. West Virginia, 1879, 100 U.S. 303, 25 L.Ed. 664, the state law which by its terms permitted only white men for jury service, was challenged as being in contravention of the Fourteenth Amendment. The Court approached the problem by stating the question to be not whether one is entitled "to a grand or petit jury composed in whole or in part of persons of his own race or color, but it is whether, in the composition or selection of jurors by whom he is to be indicted or tried, all persons of his race or color may be excluded by law solely because of their race:

---

[5] This is limited to clerks and jury commissioners in Federal Courts and I do not wish to be understood to be ruling upon the powers of Commissioners or other Officials of State Courts in selecting and listing jurors under Sec. 205, Calif. Code of Civil Procedure.

or color, so that by no possibility can any colored man sit upon the jury." Obviously under the terms of the statute no colored man could or would be selected to serve as either a grand or petit juror, and the Court held the statute void as being in contravention of the equal protection clause of the Fourteenth Amendment.

The question postured by the above language whether "by no possibility can a colored man sit upon the jury" is the same approach which was taken by the Supreme Court in Smith v. Texas, with this difference: In Smith v. Texas they extended the inquiry to a determination whether or not conduct of officials, under a law which did not exclude colored men, was such as to evidence an intent on their part to devise a system or method which in its operation would exclude any reasonable possibility of excluding colored men. In other words, the Court in Smith v. Texas did no more than to extend the Strauder holding to cover what was an obvious and deliberate attempt on the part of the officials involved to circumvent the holding of the Strauder case and the statutory law of Texas by so devising a system of selection that not only resulted in having so few colored men called, but which also "almost invariably" resulted in a colored man being No. 16 on a list of 16, when only the first 12 who were qualified on the list were to be selected for the grand jury. While the testimony of the jury commissioners [6] showed that they did not intentionally exclude Negroes, the Court pointed out that "chance and accident" could not have been responsible for the only colored man on the list to "almost invariably" appear as No. 16. Thus the decision actually turned on the fact that the Court held that there was a systematic and intentional plan on the part of some one to exclude Negroes. The nub of the decision, as I read it, was not the number or percentage of Negroes who did or did not appear on the list, but was the intent to exclude them.

In Smith v. Texas the Supreme Court did no more than to follow the pattern of inquiry which it had previously followed in Neal v. Delaware, 1880, 103 U.S. 370, 26 L.Ed. 567; Carter v. Texas, 1900, 177 U.S. 442, 20 S.Ct. 687, 44 L.Ed. 839; Norris v. Alabama, 1935, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074; and Pierre v. Louisiana, 1939, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757, where challenges to juries were sustained under the Fourteenth Amendment; and in Gibson v. Mississippi, 1896, 162 U.S. 565, 16 S.Ct. 904, 40 L.Ed. 1075, Smith v. Mississippi, 1896, 162 U.S. 592, 16 S.Ct. 900, 40 L.Ed. 1082, and Williams v. Mississippi, 1898, 170 U.S. 213, 18 S.Ct. 583, 42 L.Ed 1012, where challenges to juries under the Fourteenth Amendment were overruled.

In Hill v. Texas, 1942, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559, the Court held that the jury commissioner "consciously" excluded Negroes, and in Akins v. Texas, 1945, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692, a companion case to Hill v. Texas, the Court held against the challenge to the jury on the ground that the evidence showed that the jury commissioners did not deliberately and intentionally exclude Negroes. None of these cases are contrary to what I have set forth above as the holding of the Thiel case, nor the Glasser case, nor the Ballard case.

Coming now to the evidence in this case. The jury commissioner has occupied that position for the past 16 years. Neither he nor the clerk kept records of the names or the sources of names submitted during that period of time. The commissioner [7] had to rely upon his memory, except that several comparatively recent lists he had submitted were still in the hands of the clerk and were made available and are in evidence.

The definite testimony as to these lists submitted by the commissioner goes back to the February 1944 list, since which time he has submitted a total of 6,708 names, of which 4,878 were taken at random by him from the telephone book, 1,068 names of women at random from the Southwest Blue Book, 500 names of men from the Southwest Blue Book who lived in Pasadena and that area, 27 names of women from the

---

[6] Only two out of 96 testified, and I suppose the Court indulged the presumption that witnesses who could be but were not produced would be adverse.

[7] Who, incidentally, testified that the maximum pay received by him was approximately $15 a year, which he has paid out, and more, in having girls copy lists of names.

Friday Morning Club, submitted to him upon his request by the management of the club, 58 names of women from the Ebell Club submitted to him upon his request by the management of that club, 69 names of women from the Congress of Parent-Teachers Association, an organization consisting largely of women covering every section of the city and county, and having for its purpose the fostering of cooperation between parents and teachers, 24 names from a Japanese preacher (there were 12 men and 12 women on that list), and an unidentifiable number from a list of automobile owners which he had borrowed from some one.

Some point was made by the defendants concerning a list submitted by the commissioner of names of members of the Los Angeles Country Club (a golf and social club) and of the University Club (a name which is descriptive of its membership) and the California Club (a social club consisting largely of businessmen, if not entirely), but these names did not in total exceed a few hundred, and were submitted by the commissioner at least 15 years ago. None from these sources have been submitted by him since. Of the 6,708 names submitted by the commissioner since 1944, it turned out that 4,104 are men and the remainder were women.

The present clerk, who has been holding his office since 1942, and prior to that time was a deputy clerk for many years, testified that he followed as near as he knew the same procedure followed by his predecessors since 1924 or 1925.

In addition to the names submitted by the commissioner, the clerk has a filing cabinet with card index drawers which contain the names of 25,000 or 30,000 persons. These are referred to as his "available box." The cards have only the name, address, telephone number if there is a telephone, and previous jury service on them, and nothing else except on an old card occasionally an occupation is listed. The names have been collected by the clerk and his predecessors from various sources since 1925. Practically all of them are the names of persons who have at one time or another served on juries on previous occasions and have thus been found to be qualified under the Cali-

fornia law, that is to say, they come within the requirements of the Code of Civil Procedure of the State of California, Sections 198, 199 and 205, requiring that they shall be citizens over the age of 21, residents of the State and County for one year immediately before being selected, and in possession of their natural faculties and ordinary intelligence and not decrepit, and possessed of sufficient knowledge of the English language and, as prescribed by Section 205 of the Code of Civil Procedure of the State of California, of "fair character and approved integrity, and of sound judgment" and have not been convicted of malfeasance in office or any other felony, and have not served upon any jury within at least two years previously.

The clerk of the court has in addition to the names supplied by the commissioner added some other names to the available box of his own selection from time to time such, as he testified, some Chinese recently, the names of approximately 100 persons of the Negro race, gathered for him by one of the deputy clerks, who is also a Negro. In this connection, the commissioner also stated that he submitted some names of Negroes supplied to him upon his request by a Negro preacher. No particular point is made by the defendants concerning the alleged exclusion of Negroes. As a matter of fact, Negroes were on the February 1946 grand jury, and several of them have appeared from time to time throughout the entire last year on trial jury panels in this court. I recall one case where two Negroes were selected and served among the 12 jurors.

These two sources, that is, the available box of the clerk and the lists submitted by the commissioner, are the sole sources of names.

The procedure followed, which the clerk testified is constantly going on, is that upon receipt of a list of names by the commissioner the clerk will select at random an approximate equivalent number of names from his available box. Since the report of the Conference of Senior Judges in 1942, Exhibit No. 2 in evidence, was received in this District, questionnaires have been used on the form of Exhibit B and they have been sent to the names submitted by the

commissioner and the recently selected names from the clerk's available box.

Upon return of the questionnaires, the clerk and the jury commissioner go over them together after they have been alphabetically arranged and eliminate those who are incompetent to serve, that is to say, only those who appear on the face of the questionnaire either to be under age, or not citizens, or who appear not to reside any more in the state of California or this District, or not to have resided within it for one year, and those who are practicing lawyers. Neither the clerk nor the commissioner in any manner attempt to pass on any exemptions or claimed exemptions. That is and has been left entirely to the discretion of the senior judge or the judge who impanels the jury.

Upon receipt of an order by the senior judge to put names in the box, which is usually in the form of Exhibit A, tickets of exact size and color, with nothing on them except the name of the prospective juror who has returned a questionnaire, are typed. The clerk will take a sufficient number of such tickets to comply with the order. Then he and the commissioner will each alternately pick up a ticket, read the name aloud, and drop it into what is referred to as the "master box," from which the panels are drawn The only names discarded by either the clerk or the commissioner upon this operation is when one or the other knows that the person whose name is called has died or has moved from the community. The master box is the box from which the panels are drawn when a new panel is required for service in the court. The drawing is done in the presence of the Court, the clerk and others, sometimes in chambers and sometimes in the courtroom. The venire is then issued to the marshal, the persons are summoned to appear upon a stated date and hour, at which time the senior or impaneling judge will hear the excuses and grant or deny them as in his discretion should be done. The same procedure is followed for the impanelment of the grand jury, and those names are taken from the master box as above described in identically the same fashion and originate from identically the same sources.

When the master box is emptied, the names remaining in it and those excused temporarily then go back to the clerk's available box. The names of all those jurors who serve go into another box of records kept by the clerk, which he calls the "leave-out box," where they are retained for a period of at least two years, he said usually longer, in accordance with the requirements that a person shall be disqualified under the state law for two years after his last jury duty. At the end of two or more years these cards are again distributed to the available box, where they are subject to future random selection by the clerk in the manner above set forth.

The defendants contend that this method or system of selecting jurors results in the exclusion of persons in the low income groups which are described in the motion as "laborers, people working by the day or hour, members of labor unions."

The principal evidence offered in support of this contention was the analysis and classification of occupations by the expert witness in his testimony. His bias and manner of testifying detracted considerably from the probative value of his testimony, but even so, considering his testimony in its most favorable light, it does not bear out this contention or support it. He used the 1940 census classification as the basis of his conclusions. As heretofore indicated, I do not consider those classifications as reasonable or appropriate for an inquiry of this nature, but assuming them to be correct for the purpose of applying the expert's testimony, his opinions and conclusions show that of 1,103 persons selected for the 1946 and 1947 panels for whom information is available, all of the 12 classes were represented except domestic workers and farm laborers, and as heretofore noted those two classes covered only one occupation. So the effect of his testimony is that all the 167 occupations were represented in the panels except the two just mentioned. Such a result in this complex metropolitan community, with a population of over 3 million in Los Angeles County alone, scattered over an area of over 4,400 square miles, sustaining almost every conceivable kind of business, industry and occupation,

cannot be said to be so unfair as to be illegal under the holdings of the cases.

While the expert testified that only once in an astronomical number of times would a panel be drawn with the distribution of occupations which occurred on each of the panels, grand and petit, for 1946 and 1947, the record does not show any computation of probabilities as to the number of times 281 persons (the 1946 panel for which information is available) or 822 persons (the 1947 panel for which information is available) would be selected out of more than 3 million population, with the result that only 2 out of 167 occupations would not be represented.

In speaking of distribution of occupations, attention again is called to the fact that of approximately 350 questionnaires selected at random from those in evidence they show approximately 250 occupations given by the prospective jurors.[8]

---

[8] That list of occupations is as follows:

Painter
Camera Representative
Retired on old age pension
Insurance agent
Real Estate Appraiser
Insurance Manager
Restaurant Owner
Retired
Stage and Property Hand
Furniture Repair Man
Sound Recorder
President of Trucking Company
Manager of a Lumber Business
Petroleum Engineer
Insurance Adjuster
Advertising Business
Real Estate Broker and Notary Public (who wanted to be excused because it interfered with his business)
Manager of a Motion Picture Theater, who was also a graduate lawyer and Special Deputy Sheriff
Telephone Company Employee
Investment Securities on a commission basis
Public Accountant
One-man Real Estate Loans
Railway Accountant (Retired)
Investment Counsel
Numerous "housewives" without any other indication
Statements that a person is simply "in the banking business" or "insurance business"
Retired Florist
Owner of a bar and cafe
Geologist
Stationary Engineer
Transportation Foreman, Telephone Business
Produce Merchant
Telephone Company Supervisor
Banking Business
Landlord
Field Man
Machinist
Guard
Self-employed
Housekeeper
"Write some fire insurance"
U. S. Army (Retired)
"No business"
"Not working"
Test Desk Man, Telephone Company
Ranching
Electrician
Auto Painter
Lecturer
"None"
Locomotive Engineer
Sound Technician
Electrical Trouble Shooter
Retired Merchant
Statistician
Automotive Machinist
Grocer, Produce
Engineer (Production)
Produce Buyer (who starts to work at 6:00 a. m.)
Grip Man
Secretary, Life Insurance Company
Assistant Camera Man
Widow
Sales Manager
Investments
Telephone Operator
Receiving Clerk
Baker
Tank Truck Salesman
Lead Man
Nurse
Secretary
Truck Driver
"Unemployed"
Motor Man
Liaison Man in Aircraft Plant
Branch Bank Manager
Saleslady
Sound Technician
Escrow Office
Buyer in Department Store
Grocer
Aircraft Worker on New Models for Test Flight
Hardware Salesman
Apartment House Manager
Tool Engineer
Retired Citizen
Oil Leasing
Interior Designer

Now that list, of course, does not include a perfect cross-section of the community by occupation, but it does seem to me to be a fairly liberal distribution for

Upholsterer
Market Research
Draftsman
Fire Insurance
Adjuster
Embalmer
Valuation Engineer
Retired Teacher
Motion Picture Industry, Technicolor, paid by the hours worked
Income from Real Estate
Meat Cutter
Carpenter
"Not employed at present"
Dispatcher
Artist and Repertoire Phonograph Records
Traffic Manager in the Rock Business
Flight Supervisor
Pullman Porter
Cleaner and Presser
Project Accountant
Engineer, Designer (Aircraft)
Non-active Member of the California Bar
Motion Picture (with the simple claim of exemption: I have to work)
Automotive Mechanic, self-employed
Sales Representative
Timekeeper
Experimental Mechanic
Mason (Contractor who is teaching G. I. apprentices the brick-laying trade)
One-man Sheet Metal Business
A widow doing clerical and stenographic duties, maintaining home for two minor sons
Model
Contractor
Tailoring Cashier
Business Manager
Carpenter
Stenographer
Service Man, Burglar Alarm
Janitor
Maintenance Mechanic
Railway Postal Clerk
Mechanic
Automobile Worker
Letter Carrier
Plant Repair Man
Clerk
Radio
P. B. X. Operator
Laborer (K3), No telephone
Painting Contractor
Apartment Housekeeper
Hay and Grain Dealer
Receiving Clerk in Grocery Store
Music Composer
Appraiser

Traveling Salesman
Assistant to Manager of Credit Union at Film Studios
Stenographer, Board of Park Commission of the City of Los Angeles
Service Station Operator
Saleslady for Mausoleum
Machine Tool Maintenance Man
Foreman of the Telephone Company
Wholesale Produce Business
Retired Construction Engineer
Office Manager
Social Worker
Consignment Clerk
School Nurse
Housekeeper
Design Engineer
General Foreman
Electrical Salesman
Vending Machine Collecting and Service
Secretary-Accountant
General Manager of Radio Station
Bakery Wagon Driver
Paint Department Foreman
Rancher
Journeyman Plumber
Printer's Helper
Office Work
Development Engineer
Practical Nurse
Carpenter Foreman
Stenographer
Furniture Assembler
Registered Pharmacist
Engineer, Storage Battery
Working Man in Laundry
Music Teacher
Aircraft Planner
Motion Picture Producer
Butcher and Meat Cutter
Mechanic and Welder
Surveyor
Repair Man
Motion Picture Equipment Repair Man
Publicity Writer
Auditor
Commercial Fishing
Chemist
Carpenter
Structures Engineer
Grocer
Machinist
Actor
Rate and Percentage Clerk
Janitor
Architectural Designer
Cafe
Truck Driver
Ice Cream Manufacturer
Purchasing Agent
Cashier

that number of persons and does not include, by any means, an examination of all the questionnaires. It cannot be said that those occupations do not cover people who are paid by the hour or who are paid by the day. Unions cut across many of those occupations, if not most of them, and it was conceded that unions cut across all the 167 occupations included in the Census Bureau Classification which was used by the expert witness. Who can say if any other method were used that the result obtained would not be an exclusion of some occupational groups, or a more or a different disproportionate distribution of occupations than existed on the 1946 panel or exists on the 1947 panel? And if all occupations were represented, which in the practicalities of life is actually impossible, unless the number of jurors is going to be increased far beyond 12 and actually to mob size, would not then some one make a classification of the religions of those selected, or their social connections, or their sex, or their race, or their geographical location, and come up with a statistical abstract which showed disproportionate distributions or exclusions of any of the multitude of religions represented in this community, or a disproportionate distribution or exclusion of any group which might be classified by any other common characteristic? Proportional representation is not possible, nor is it permitted or required under the law. The defendants concede that exact mathematical proportional representation is not required, but assert that disproportional distributions in which a particular occupational group is not represented is invalid. If proportional representation on a panel is not required, then disproportional representation is not invalid, unless it is the result of a systematic and intentional exclusion of persons or

| | |
|---|---|
| Maintenance Foreman Air Terminal | Tool Maker |
| Foreman in Metals Plant | Fruit and Vegetable Business |
| Silver Solderer | Grocer |
| One-man Auto Service Business | Distribution Foreman, City Water Department |
| Barber | |
| Post Office Clerk | Assistant Chief Clerk |
| Teacher of Chemistry | Police Officer |
| Consultant Forester, Structural Pest Control | Deputy City Clerk |
| | Government Accountant |
| College Student | Housekeeper and Apartment Manager |
| Home Maker | |
| Service Station Operator | Shop Superintendent |
| Pay Roll Clerk | Pharmaceutical Sales |
| Truck Crane Operator | Foreman, Melting Department |
| Carpenter | Deputy Sheriff |
| Merchant and Apartment Hotel Operator | Contractor, Ladies Garments |
| | Materials and Process Coordinator of Army Air Force Foundryman |
| Owner, Pest Control Service | |
| Tool Designer, Aircraft | Welder |
| Rug and Carpet Salesman | Electrician |
| Wholesale Furniture Business Owner | Personnel Assistant, Navy Cost Inspection |
| Ball Bearing Engineer | Manager of Paint Company |
| Garage Manager | Bank Employee |
| Traffic Crossing Guard | Auto Electrician |
| Hotel Operator | Clothing Merchant |
| Foreman, Inspection | Pilot |
| Foreman, Concrete Emulsions | Clerk of Textbook Department in School System |
| Actor | |
| Investigator for the District Attorney | Civil Engineer |
| | Truck Driver |
| Credit Manager | Former Teacher |
| Jeweler | Post Office Clerk |
| Tool and Die Maker | Retired Editor, Publisher and Printer |
| Mechanic, Street Department, City of Culver City | |
| | Meat Market Owner |
| Distributor | Many Retired |
| Los Angeles Park Department, Foreman | Numerous Housewives |
| | Many left space blank |

groups by the clerk or the commissioner, either directly or by the intentional devising of a system or method of selection, which is bound to result in such systematic exclusion.

The Ninth Circuit had this question before them on June 2, 1941, after the decision of the Supreme Court in Smith v. Texas, in the case of Wong Yim v. United States, 9 Cir., 118 F.2d 667, 668, a case arising in Hawaii where the contention was made that the jury must "represent each nationality in the territory" and that the list "did not contain the various percentages of persons of a particular nativity," as that percentage was calculated and set forth in the opinion. As to that contention the Court stated on page 669 of the opinion: "The rule is that a violation of the clause (due process) occurs if in the jury there is a systematic and arbitrary exclusion of, or a discrimination between, persons of a particular race. (Citing cases, the first one of which is Smith v. Texas.) In the instant case, there is no evidence to show that the trial jury drawn from the box was obtained either by discrimination or by excluding any name, and the mere fact that the jurors drawn from the list represented only certain races, does not show that the list was made to include only two or three races, or that it was in any manner discriminatory."

And what applies to persons having the common characteristic of race or nationality applies as well to persons or groups having other common characteristics.

■ The above cases would seem to dispose of the contention of the defendants that the panels are invalid on constitutional or other grounds because they did not, or do not, contain "groups or classes of persons to which the defendants belong." But there are other reasons which must be noted in not acceding to this contention. The allegations of the indictment with respect to which group or class the defendants belong must be taken as true for the purposes of this motion, particularly as there was no evidence to the contrary. Those allegations are to the effect that the defendants "are not employees, workers, or laborers who receive a salary or wage for their work or labor, but are independent

businessmen engaged in business on their own account, and who operate fishing boats for their own account and profit." A defendant cannot complain because there are too many businessmen on the panel and at the same time prevail because he asserts there are none.

■ Moreover, it is no denial of any constitutional right, even if there were no persons on the jury panel belonging to the "groups or classes of persons to which the defendants belong." Their right is to an "impartial" jury. It is the right to reject jurors and not to select them. Hayes v. Missouri, 1887, 120 U.S. 68, 7 S.Ct. 350, 30 L.Ed. 578; Spies v. Illinois, 1887, 123 U.S. 131, 8 S.Ct. 22, 31 L.Ed. 80; Brown v. New Jersey, 1899, 175 U.S. 172, 20 S.Ct. 77, 44 L.Ed. 119; Howard v. Kentucky, 1906, 200 U.S. 164, 26 S.Ct. 189, 50 L.Ed. 421. To hold with the defendants in this connection would be to hold that as a matter of law an implied bias existed in the minds of persons of all other groups than a defendant regardless of an actual state of mind (that is the way the question was approached by Chief Justice Hughes in United States v. Wood, 1936, 299 U.S. 123, 57 S.Ct. 177, 81 L.Ed. 78, where the constitutional question was involved in an ordinance of the District of Columbia) and for the Court to further hold that such other groups would decide cases, not from the evidence or instructions, but from their prejudices, in spite of an oath to do otherwise. In the Jugiro case, 1891, 140 U.S. 291, 11 S.Ct. 770, 772, 35 L.Ed. 510, the Supreme Court stated "no person * * * is entitled, by virtue of the constitution of the United States, to have his race represented upon the grand jury that may indict him, or upon the petit jury that may try him." The same thing applies, as indicated, to groups having a common economic or other common characteristic. Every person is entitled not to have his race or persons with other common characteristics purposefully or intentionally and systematically excluded. There is not the slightest evidence in the record in this case that the class or group of persons to which the defendants belong, or any other class or group, were systematically or intentionally excluded, or that the system used was

calculated or intended to result in their systematic exclusion.

Under the system used by the clerk and the commissioner, neither of them have any information concerning the economic status, occupation (except in unusual cases where an old card in the available box shows it), rate of pay, quantity of pay, method of pay, or time of pay, nor any information concerning the race, color, religion, political affiliation or social connections or lack of them, prior to the time the information is furnished on the questionnaire by the prospective juror, and only about one-third of those are returned.

The geographic location is of course indicated approximately by the address, and the sex is, or should be, indicated by the name. There is one exception to the foregoing statement, which is that the name selected by the commissioner from the Southwest Blue Book usually would indicate some type of social affiliation, but not necessarily so. The 1,600 names submitted in 1945 from that source have gone through the process of questionnaires, and it is a fair inference that their response was not better than the average, which would reduce the number considerably. Moreover, they have been subjected to reduction by excuses and the like, so that the remaining ones have now lost all their identity in the available box of 25,000 or 30,000 names, so that it cannot be said that the use of that source is or could be any ground of illegality.

Likewise, the names secured by the commissioner from women's clubs are too small in number to be of legal significance in this matter. The commissioner testified that by far the greater number of names submitted by him were taken at random from the telephone book. In selecting names he paid no attention to the type of name, he testified, or the address, or the telephone prefix, or the occupation if it was indicated, and there is no way of knowing from the telephone book the race, religion, economic status, rate, quantity or method or time of pay, political affiliation or social affiliation, or lack of them, of a person whose name is listed. The only information supplied by the questionnaire which relates to any of the above mentioned group characteristics is the occupation of the prospective juror.

Both the clerk and the commissioner testified that at no time did they together, or either one by himself, leave any name off a jury list on account of any fact relating to a person's economic status, race, religion, social affiliations, or lack of them, politics, or occupation, or rate, quantity or method or time of pay. And no evidence of any nature was offered to controvert their testimony or weaken or impeach it in any degree. Indeed, it is difficult to see how, with the paucity of information available to them about each prospective juror, they could have devised or followed any system of exclusion on any of the grounds mentioned.

■ Considerable point was made in argument against the commissioner's use of the telephone book. The choice of sources for jurors is vested by statute in the jury commissioner and the clerk (28 U.S.C.A. § 412). There is no master list of all the persons in this District or this county, nor is there a master list of eligible or competent or qualified persons. The largest lists of names, and hence the nearest ones to being a cross-section of the community, are contained in the city directory, the telephone directory and the voters' register. The city directory has not been published since 1942, due to the paper shortage. Assuming that a voters' printed list were available to the commissioner, the question is, does the use by the jury commissioner of the telephone directory void the jury lists? I think not.

The telephone directory, the city directory and the voters' register are each compiled without reference to race, religion, social status or lack of it, occupation, method, rate, quantity and time of pay, political affiliation or geographical location in the area involved, except that the voters' list does of course disclose the political affiliation. It used to disclose occupation, but the voters' list does not disclose occupation any more.

No economic status is required for listing in any of the three except that a person must desire to have a telephone and be able to pay the monthly rental for it. The defendants argue that the use of the telephone directory is thus a systematic and inten-

tional exclusion of those of the working-class who cannot afford a telephone. Arguments can be made against the use of any list, as none are available for the whole population. The clerk and the commissioner in the *Thiel* case used the city directory, and it is noted that such use was not condemned or commented upon by the Supreme Court.

While the Supreme Court in Akins v. Texas [325 U.S. 535, 65 S.Ct. 1279] was dealing with a state jury commissioner, they very pointedly remarked that the alternative to a wide discretion in the officials charged with the selection of juries would be "a list composed of all eligibles within the trial court's jurisdiction and selection of the panel by lot." As indicated, no such list is available, and I do not know when it is likely to be or if it ever will be.

It is true that the voters' lists would eliminate all those who were under 21, all those who have lived in California less than one year, and all those who lost their civil rights by conviction of a crime, which are grounds of disqualification of jurors. It is also true that I or any other person might use other methods than either the clerk or the jury commissioner to secure available material for a jury list, but I cannot say because the voters' lists or some other list was not used that the methods and lists which were used by the commissioner and the clerk were illegal, or resulted in the unlawful selection of juries, either grand or petit.

■ The making of a jury list is not a judicial act. (Clinton v. Englebrecht, 13 Wall. 434, 446, 20 L.Ed. 659.) The manner of securing names for the jury lists is for the clerk and the jury commissioner to determine; the duty is non-delegable and no other person has a right to participate in such selection (Walker v. United States, 8 Cir., 93 F.2d 383, certiorari denied 303 U.S. 644, 58 S.Ct. 642, 82 L.Ed. 1103; In Re Petition for Special Grand Jury, D. C., 1931, 50 F.2d 973; United States v. Murphy, D.C., 224 F. 554; and Glasser v. United States, 1942, 315 U.S. 60, 85, 62 S.Ct. 457, 86 L.Ed. 680), except that a court may, under 28 U.S.C.A. § 413, direct the jurors to be selected from such parts of the district as shall "not to incur an unneces-sary expense, or unduly burden the citizens of any part of the district."

In United States v. McClure, D.C., 4 F.Supp. 668, 671, the Court stated, with relation to the duties of the officers of the District Court charged with the matter of securing jury lists, that it "is their responsibility, and no court has the right to tell the duly constituted jury commissioners how they shall discharge the duties and responsibilities imposed upon them by the law. The court has the power only to declare their actions null and void under circumstances of malfeasance or misfeasance."

■ While there is some language in both the majority opinion and the minority opinion in the *Thiel* case, as well as in the Ballard case, from which it might be argued that the Supreme Court intended to say the District Judges have the power to direct the method or system to be used by the clerk and the jury commissioner in the selection of jury material, it is my judgment, in view of the holdings of the cases last cited, as well as all the other cases cited in my remarks, that this court has no such power but may only sit in review of their acts and conduct.

■ And it is my conclusion, in the exercise of that power of review, that neither the clerk nor the commissioner showed any bias or prejudice in the selection of names or sources of names of prospective jurors, and that neither of them systematically or intentionally or arbitrarily excluded any person or persons, or groups or classes of persons, either on account or because of economic status, occupation, rate or quantity or method or time of pay, race, religion, sex, social connections or affiliations or lack of them, or political affiliations; nor does the system and method or process used by them now, or for the 1946 grand jury, result in such exclusion. The geographic selections made by them were in accordance with the various orders of the senior judge made pursuant to the command and the power given him in 28 U.S.C.A. § 413.

It follows, therefore, that the motion to dismiss the indictment and the motion to strike the 1947 jury panel are both denied.