[Crim. No. 5613. In Bank. Dec. 31, 1954.]

THE PEOPLE, Respondent, v. JOSEPH WHITE, Appellant.

William B. Esterman and William B. Murrish for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

CARTER, J.—Joseph White was charged in count I of an information with assault with intent to commit rape upon Velma Gonzales on November 17, 1952. In counts II and III he was charged with rape and a violation of section 286* of the Penal Code committed upon Agapita Gallegas, both offenses alleged to have been committed on October 27, 1952. He pleaded not guilty as to each count and moved to challenge the jury panel upon the ground that there had been a systematic exclusion of Negroes, working people, men, and young persons. The motion was denied. Upon defendant's motion for a severance, the court ordered separate trials of the charges relating to each victim. Counts II and III were tried first and the jury found defendant guilty on both counts. He was sentenced to the state prison for the term prescribed by law as to each offense, the sentences to run concurrently. Count I was then dismissed. Defendant has appealed from an order denying his motion for a new trial and from the judgment.

There was evidence presented at the trial to the effect that shortly after Mrs. Gallegas had left her place of employment in downtown San Bernardino, in the early evening of October 27, 1952, she was accosted and forced into an empty lot where her assailant raped her and committed a violation of Penal Code, section 286. On November 18, 1952, defendant was arrested and taken to the police station where he was identified by Mrs. Gallegas as her assailant. Mr. Parker, a parole officer for the California Youth Authority, testified that during an interview defendant made a statement admit-

---

*"Every person who is guilty of the infamous crime against nature, committed with mankind or with any animal, is punishable by imprisonment in the state prison not less than one nor more than ten years." (Pen. Code, § 286.)

ting the commission of the crimes charged. There was also testimony to the effect that defendant had confessed to Deputy District Attorney Hartley in the presence of a shorthand reporter, Roy Cain, who testified concerning the contents of the statement taken down by him. Defendant made no argument concerning the voluntary character of these confessions but merely denied having made them.

■ Defendant contends that the district attorney committed prejudicial misconduct in the cross-examination of Maria Lawson, one of the character witnesses for the defense. After the witness had testified on direct examination as to defendant's good reputation in the community for chastity, virtue and morality, she was asked on cross-examination: "Had you heard that reports had been given to the San Bernardino Police Department that Joe White carried on homosexual activities in Meadowbrook Park?" Defendant objected and moved to strike the question on the ground that it had been asked in bad faith and without factual basis. The objection was overruled but the court reserved a ruling on the motion to strike and the witness answered in the affirmative. From her answer it was evident that she did not understand the question and after the meaning of "homosexual" was explained to her, she stated that she had not heard such reports. A hearing was had (outside the presence of the jury) on the issue of the prosecutor's good faith in asking the question. At the hearing the prosecutor testified that his question was based upon information concerning defendant's homosexual activities gained from oral reports and written arrest reports received from Officer Avery of the San Bernardino Police Department, Mr. Parker of the California Youth Authority and Mr. Hartley of the district attorney's office. He testified that he had researched the law on the propriety of such a question and had conferred with other members of his office about the legal point involved and that the consensus of opinion was that the question was a proper one. In view of this the trial court's finding that the question was asked in good faith and its refusal to strike the question are not without support. ■ In this connection it is also contended that the court erred in failing to give, of its own motion, an instruction to the effect that questions concerning such reports are not proof of the facts therein contained and are not to be considered as evidence. Not only was such instruction not asked for (*People* v. *Stevens,* 5 Cal.2d 92, 100 [53 P.2d 133]) but a negative

answer was given by the witness. Under the circumstances defendant would appear to have suffered no prejudice.

It is further contended by defendant that certain testimony of Mr. Parker relating to a confession was improperly admitted. After defendant on cross-examination had denied making any statements amounting to a confession, Mr. Parker was called as a rebuttal witness. He testified that during their conversation the defendant had made the confession which he had denied on cross-examination. Defendant contends that it was error to admit Parker's testimony without preliminary proof that the confession was free and voluntary. Defendant did not object to the admission of the testimony at the trial on that ground and apparently no testimony was introduced at the trial indicating that the confession had been obtained by improper threats or promises. ■ It is true that a confession not shown to have been freely and voluntarily made cannot be used for the purpose of impeachment (*People* v. *Rodriguez*, 58 Cal.App.2d 415, 419-420 [136 P.2d 626]); however, when no objection has been made in the trial court as to involuntariness and no evidence is presented to show the involuntariness of the confession, it is not error to admit it for the purpose of impeachment (*People* v. *Byrd*, 42 Cal.2d 200, 210 [266 P.2d 505]).

It is next contended by defendant that the court erred in instructing the jury (1) on the presumption of innocence; (2) on circumstantial evidence; and (3) "in unexplained reference to Counts II and III." ■ With respect to the presumption of innocence the court gave an instruction in the language of section 1096* of the Penal Code and then added the following: "If, when considering all the evidence, the jury are satisfied to a moral certainty and beyond a reasonable doubt that the defendant is guilty, then the presumption of innocence no longer prevails and you should find the defendant guilty." Defendant argues that these

---

*"'A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal, but the effect of this presumption is only to place upon the state the burden of proving him guilty beyond a reasonable doubt. Reasonable doubt is defined as follows: 'It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge.'" (Pen. Code, § 1096.)

added words suggested a distinction between the objective evidence and the presumption of innocence and that it therefore deprived him of his right to have all of the evidence, including the presumption, considered until a verdict was reached. The instruction, as given, merely told the jury that if after considering all the evidence (and this would include the presumption of innocence) they were satisfied that defendant was guilty beyond a reasonable doubt they should find him guilty since the presumption of innocence would then no longer apply. While not identical, the instruction is similar to the one upheld in *People* v. *Arlington*, 131 Cal. 231 [63 P. 347], and there would appear to be no prejudicial error.

■ In regard to circumstantial evidence the court instructed, in part, as follows: "You are not permitted on circumstantial evidence alone, to find defendant guilty of any crime charged against him unless the proved circumstances not only are consistent with the hypothesis that the defendant is guilty of the crime, but are irreconcilable with *any rational* conclusion." (Emphasis added.) Defendant argues that the omission of the word "other" before the word "rational" rendered the instruction ambiguous and meaningless, with the effect of depriving the defendant of his right to a jury trial. It is difficult to see how such an omission could have misled the jury. Moreover, the People's case rested chiefly on direct evidence and was merely corroborated by some circumstantial evidence. ■ The references to counts II and III, of which defendant complains, were made by the court in instructing the jury as to the form of the verdicts. The court merely instructed the jury that if they found certain elements to be present they were to find defendant guilty as "charged in count II of the Information." The reference to count III was similar. Defendant argues that this reference to counts II and III could not have failed to arouse the curiosity of the jury as to the existence and nature of another unmentioned count. It is difficult to see how any substantial prejudice could have resulted from a mere passing reference of this nature. Indeed, if any curiosity was aroused the jury could well have thought that count I had been dismissed for lack of evidence or that the defendant had already been acquitted of it.

Defendant also contends that the trial court erred in limiting one phase of the cross-examination of the prosecutrix. There is little merit in this contention. The incident complained of arose after the prosecuting witness had explained

how, on the day of the alleged attack, she had happened to punch her time card out at 4:37 p. m. and yet not leave her place of employment until 5:35 p. m. Thereafter counsel for defendant insisted upon returning to the matter with an argumentative line of questioning. ■ It is well established that where questions are asked which are improper, the court acts within the scope of its duty in refusing to allow them to be answered, even though no objection be made. (*People* v. *Parry,* 105 Cal.App.2d 319, 322 [232 P.2d 899]; *People* v. *Yuen,* 32 Cal.App.2d 151, 160 [89 P.2d 438]; *People* v. *Bartley,* 12 Cal.App. 773, 777-778 [108 P. 868].) ■ Where, as here, the questioning is purely argumentative it is properly excluded. (*People* v. *Harlan,* 133 Cal. 16 [65 P. 9]; *Kimball* v. *McKee,* 149 Cal. 435 [86 P. 1089]; *People* v. *Ramey,* 70 Cal.App. 92 [232 P. 724]; *Newsom* v. *Smiley,* 57 Cal.App.2d 627 [135 P.2d 24]; *People* v. *Horowitz,* 70 Cal. App.2d 675 [161 P.2d 833].)

Defendant further contends that the testimony of the complaining witness was inherently improbable in that she and her assailant would have reacted differently had she actually been raped. It is argued that certain testimony, such as that her assailant helped her pick up the contents of her purse, that he kissed her, that she went to work the next day, etc., is unbelievable when considered with other factors. ■ It is true that an appellate court will not uphold a judgment or verdict based upon evidence which is inherently improbable; however, it is not sufficient that the circumstances disclosed by the testimony are merely unusual. (*Kidroski* v. *Anderson,* 39 Cal.App.2d 602, 605 [103 P.2d 1000].) ■ As stated by this court in *People* v. *Huston,* 21 Cal.2d 690, 693 [134 P.2d 758], "To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. (*Back* v. *Farnsworth,* 25 Cal.App.2d 212, 219 [77 P.2d 295]; *Lufkin* v. *Patten-Blinn Lumber Co.,* 15 Cal.App.2d 259, 262 [59 P.2d 414]; *Agoure* v. *Spinks Realty Co.,* 5 Cal.App.2d 444, 451 [42 P.2d 660]; *Hughes* v. *Quackenbush,* 1 Cal.App.2d 349, 354, 355 [37 P.2d 99]; *Powell* v. *Powell,* 40 Cal.App. 155, 158, 159 [180 P. 346].) ■ Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and

the truth or falsity of the facts upon which a determination depends. (*Hicks* v. *Ocean Shore Railroad, Inc.*, 18 Cal.2d 773, 781 [117 P.2d 850].)'' In the case at bar there is nothing which would indicate that the testimony of the prosecutrix was so inherently improbable that it could not have been accepted by the jury.

Defendant's principal contention is that the trial court committed prejudicial error in denying his motion to dismiss the entire jury panel and that as a result he was denied his constitutional right to a trial by an impartial jury. In support of this position defendant alleges that the method used in selecting the jury panel resulted in the systematic exclusion of certain classes, such as hourly workers, of which defendant was a member, and the systematic inclusion of limited classes of persons who did not represent a cross-section of the community. It appears that the panel, from which the jury for defendant's trial was selected, consisted of 525 people, all of whom came from a number of townships in and around the city of San Bernardino. A sampling taken of part of this panel indicated that approximately 53.32 per cent were housewives, 14.8 per cent were businessmen and women, 10 per cent were retired businessmen, 17.34 per cent were salaried workers, 1.27 per cent were hourly workers, 4 per cent were retired workers and 3.57 per cent were ranchers. Of the spouses of 178 of the members of the panel, 30 were hourly-rated workers, 85 were salaried workers, 15 were ranchers and 48 were businessmen. On an age basis approximately 22.7 per cent of the panel were under 35 years of age, 35.4 per cent were in the 36 to 45 age group, 16.8 per cent were in the 46 to 55 age group and the remainder were over 55 years of age.

In explaining the method by which jury panels were selected, the jury commissioner testified that each year questionnaires were sent to persons whose names appeared on the membership lists of organizations such as the Rotary, Kiwanis, Lions, Exchange Club, 20-30 Club, Chamber of Commerce, and on the membership lists of women's clubs. Questionnaires were also given to persons who volunteered and to those who were recommended by other citizens. Former jurors were frequently placed on the panel if they so requested. The jury commissioner also testified that an attempt was made to get as many businessmen on the panel as possible, because such people had in the past been excused frequently, and the attorneys of the county were anxious

to have such persons serve; that the sources from which the names of those to whom questionnaires were sent included persons of Mexican and Negro origin as well as hourly wage earners; and that no attempt was made to exclude persons on the basis of race or because they were of the laboring class.

It is well recognized that "The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. *Smith* v. *Texas*, 311 U.S. 128, 130 [61 S.Ct. 164, 85 L.Ed. 84]; *Glasser* v. *United States*, 315 U.S. 60, 85 [62 S.Ct. 457, 86 L.Ed. 680], This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society." (*Thiel* v. *Southern Pac. Co.*, 328 U.S. 217, 220 [66 S.Ct. 984, 90 L.Ed. 1181, 166 A.L.R. 1412]; see also 31 Am.Jur. 1953 Supp., Jury, § 83.) Where no particular source is required by law, jury lists have been compiled in various ways and from numerous general sources such as from city directories (*State* v. *Lawrence*, 124 La. 378 [50 So. 406]), from the register of voters (*People* v. *Hess*, 104 Cal.App.2d 642 [234 P.2d 65]; *People* v. *Dessaure*, 68 N.Y.S.2d 108 [affirmed in 79 N.Y.S.2d 516]) and from telephone directories (*State* v. *Dorsey*, 207 La. 928 [22 So.2d 273]; *United States* v. *Local 36 of International Fishermen*, 70 F.Supp. 782.) The principal requirement is that there should be no systematic and intentional exclusion of any group or groups of citizens from the prospective jury lists. (31 Am.Jur. 617-620, Jury, §§ 83-88; 1 A.L.R.2d 1291-1398.)

It has been stated that any ". . . intentional, planned, and deliberate exclusion of or discrimination against members of a particular political or economic group, religious faith, race, or sex, by officers in charge of the selection and summoning of jurors, is in contravention of the constitutional right to jury trial and of the 'due process' and 'equal protection of the laws' clauses of the Fourteenth Amendment of the Federal Constitution, at least as against an accused on trial or litigant belonging to the class or race discriminated against." (31 Am.Jur. 617.) Just what does and

what does not constitute a systematic and intentional exclusion of certain groups has never been too well defined but it is well established that merely because names are compiled in part from special types of directories such as Who's Who, The Blue Book, Social Register or club lists does not in itself condemn the list as a whole or the manner of its compilation. (*United States* v. *Local 36 of International Fishermen, supra*, 70 F.Supp. 782; *United States* v. *Dennis*, 183 F.2d 201.) This is true since in general the clerk or jury commissioner is ". . . free to go to any source for persons to call." (*United States* v. *Local 36 of International Fishermen, supra*.) The principal question is whether the list as a whole is improperly weighted so as to prevent having a good cross-section of the community for prospective jurors. (*United States* v. *Local 36 of International Fishermen, supra*; *United States* v. *Dennis, supra*; *Glasser* v. *United States*, 315 U.S. 60 [62 S.Ct. 457, 86 L.Ed. 680].)

 The general tendency of the courts has been to permit the compilation of jury lists from membership rosters of private clubs and organizations so long as such sources are used with other general lists such as city directories, voting lists, or telephone directories (*United States* v. *Local 36 of International Fishermen, supra*; *United States* v. *Dennis supra*); but when all jurors or a predominant part of them are selected from private membership lists the basic concept of a jury panel representative of the community is lost. As stated in *Glasser* v. *United States, supra*, 315 U.S. 60, 86, ". . . the proper functioning of the jury system, and, indeed, our democracy itself, requires that the jury be a 'body truly representative of the community,' and not the organ of any special group or class. If that requirement is observed, the officials charged with choosing federal jurors may exercise some discretion to the end that competent jurors may be called. But they must not allow the desire for competent jurors to lead them into selections which do not comport with the concept of the jury as a cross-section of the community. Tendencies, no matter how slight, toward the selection of jurors by any method other than a process which will insure a trial by a representative group are undermining processes weakening the institution of jury trial, and should be sturdily resisted. That the motives influencing such tendencies may be of the best must not blind us to the dangers of allowing any encroachment whatsoever on this essential right. Steps innocently taken may, one by one, lead to the irretrievable impairment of substantial liberties.

"The deliberate selection of jurors from the membership of particular private organizations definitely does not conform to the traditional requirements of jury trial. No matter how high-principled and imbued with a desire to inculcate public virtue such organizations may be, the dangers inherent in such a method of selection are the more real when the members of those organizations, from training or otherwise, acquire a bias in favor of the prosecution. The jury selected from the membership of such an organization is then not only the organ of a special class, but, in addition, it is also openly partisan. If such practices are to be countenanced, the hard-won right of trial by jury becomes a thing of doubtful value, lacking one of the essential characteristics that have made it a cherished feature of our institutions."

 The system of jury selection primarily from the membership rosters of certain private clubs and organizations would normally tend to result in a systematic inclusion of a large proportion of business and professional people and a definite exclusion of certain classes such as ordinary working people. Any systematic attempt to exclude wage earners cannot under our democratic system be permitted. As stated in *Thiel* v. *Southern Pac. Co., supra,* 328 U.S. 217, 222-224, a case which originated in the federal district court in San Francisco, the ". . . exclusion of all those who earn a daily wage cannot be justified by federal or state law. Certainly nothing in the federal statutes warrants such an exclusion. And the California statutes are equally devoid of justification for the practice. Under California law a daily wage earner may be fully competent as a juror. A juror, to be competent, need only be a citizen of the United States over the age of 21, a resident of the state and county for one year preceding selection, possessed of his natural faculties and of ordinary intelligence and not decrepit, and possessed of sufficient knowledge of the English language. California Code of Civil Procedure, (§ 198.) *Cf.* (§ 199.) Nor is a daily wage earner listed among those exempt from jury service. (§ 200.) And under the state law, 'A juror shall not be excused by a court for slight or trivial causes, or for hardship, or for inconvenience to said juror's business, but only when material injury or destruction to said juror's property or of property entrusted to said juror is threatened . . .' (§ 201.)

"Moreover, the general principles underlying proper jury selection clearly outlaw the exclusion practiced in this in-

752

stance. Jury competence is not limited to those who earn their livelihood on other than a daily basis. One who is paid $3 a day may be as fully competent as one who is paid $30 a week or $300 a month. In other words, the pay period of a particular individual is completely irrelevant to his eligibility and capacity to serve as a juror. Wage earners, including those who are paid by the day, constitute a very substantial portion of the community, a portion that cannot be intentionally and systematically excluded in whole or in part without doing violence to the democratic nature of the jury system. Were we to sanction an exclusion of this nature we would encourage whatever desires those responsible for the selection of jury panels may have to discriminate against persons of low economic and social status. We would breathe life into any latent tendencies to establish the jury as the instrument of the economically and socially privileged. That we refuse to do.''

It is true that our United States Supreme Court has upheld the selection of so-called ''blue ribbon'' juries (*Fay* v. *New York*, 332 U.S. 261 [67 S.Ct. 1613, 91 L.Ed. 2043]) but such has no application here. In the case of *Fay* v. *New York*, *supra*, the defendant did not object to the selection of the general jury panel of some 60,000 persons but only to the selection of the ''blue ribbon'' panel of about 3,000 which was sifted from the general panel. Under the New York procedure the general panel was selected from all segments of the population and from this a special ''blue ribbon'' panel for the trial of difficult and complicated cases was selected on the basis of qualifications. The selection of jurors under this system favored those of superior qualifications for the special panel but it did not discriminate against any social, political or economic group nor against any religious faith or race.

In the case at bar persons were not excluded from the jury list merely because they were hourly wage earners or members of a minority group but the system which was used would normally tend to exclude a large portion of such persons. The jury commissioner testified that an attempt was made to get as many business people on the panel as possible. To accomplish such a purpose the commissioner, in compiling the jury list, relied almost entirely on the membership rosters of private clubs and organizations such as the Lions, Rotary, women's clubs and the Chamber of Commerce. Such a system would of necessity result in a jury list com-

posed of business people and those of the more fortunate economic strata but at the same time large segments of the population such as hourly wage earners and those of less fortunate economic circumstances would be excluded. Those persons who would be denied the opportunity for jury service under this system would not be excluded because of any lack of ability, intelligence or qualifications but merely because they did not belong to the social and economic strata of the community which comprises the membership of certain private clubs and organizations. A system which tends to permit this form of wholesale exclusion of a large segment of our citizens from jury duty would normally prevent the selection of juries from a cross-section of the community. Such a system is highly discriminatory and should not be condoned.

The precise question presented for this court's determination, by the case at bar, is whether or not the trial court committed prejudicial error in refusing to dismiss the entire jury panel. We are of the opinion that under the facts here presented it did not. ▮ It is generally recognized that as a general rule, errors and irregularities in making up a jury list will not invalidate the list when the person objecting is not a member of the group discriminated against. (*People* v. *Parman,* 14 Cal.2d 17, 19 [92 P.2d 387].) As stated in *People* v. *Hess,* 104 Cal.App.2d 642 [234 P.2d 65], "A defendant cannot complain if he is tried by an impartial jury and can demand nothing more."

▮ Even though the jury panel in question may have been selected in an improper manner it cannot be said that its actual composition resulted in any substantial prejudice to the defendant by reason of the exclusion of members of the group to which defendant belonged. The panel to which the defendant objected consisted of 525 persons. A sampling taken of part of this panel indicated that 209 were housewives, 14 were ranchers, 97 were active or retired businessmen and women and 91 were active or retired working people. Defendant's principal objection seems to be that of the 73 individuals employed as workers only 5 were hourly workers; however, as previously pointed out, of the spouses of 178 of the panel members, 30 were hourly-rated workers, 85 were salaried workers, 15 were ranchers and 48 were businessmen. It would thus appear that working people or the spouses of such persons were represented on the panel. "Moreover, it is no denial of any constitutional right, even if there were no persons on the jury panel belonging to the 'groups

or classes of persons to which the defendants belong.' Their right is to an 'impartial' jury. It is the right to reject jurors and not to select them. *Hayes* v. *Missouri* [1887], 120 U.S. 68, 7 S.Ct. 350, 30 L.Ed. 578; *Spies* v. *Illinois* [1887], 123 U.S. 131, 8 S.Ct. 22, 31 L.Ed. 80; *Brown* v. *New Jersey*, 1899, 175 U.S. 172, 20 S.Ct. 77, 44 L.Ed. 119; *Howard* v. *Kentucky*, 1906, 200 U.S. 164, 26 S.Ct. 189, 50 L.Ed. 421. To hold with the defendants in this connection would be to hold that as a matter of law an implied bias existed in the minds of persons of all other groups than a defendant regardless of an actual state of mind. . . ." (*United States* v. *Local 36 of International Fishermen, supra,* 70 F.Supp. 782, 797.)

The American system requires an impartial jury drawn from a cross-section of the entire community and recognition must be given to the fact that eligible jurors are to be found in every stratum of society. In selecting a truly representative jury panel, the membership lists of various clubs and organizations may properly be used, but they should not be relied on as the principal source of prospective jurors nor should they be used to the complete exclusion of other general sources more likely to represent a cross-section of the population, such as telephone directories, voting lists, and city directories. Any system or method of jury selection which fails to adhere to these democratic fundamentals, which is not designed to encompass a cross-section of the community or which seeks to favor limited social or economic classes, is not in keeping with the American tradition and will not be condoned by this court.

In view of our previous discussion of the matter, defendant's application to produce additional evidence, concerning the lack of good faith of the district attorney in his cross-examination of character witness Maria Lawson, could serve no useful purpose and is hereby denied.

From our examination of the record in this case, we find no error prejudicial to the rights of the defendant or which would justify a reversal of the judgment.

The judgment and the order denying the motion for a new trial are, therefore, affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., Schauer, J. and Spence, J., concurred.

Appellant's petition for a rehearing was denied January 26, 1955.