[Crim. No. 4869. Fourth Dist., Div. Two. Sept. 20, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD EARL McDOWELL, Defendant and Appellant.

## Counsel

Bernard Kelber, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Derald E. Granberg and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**GABBERT, Acting P. J.**—Appellant was charged in count I of an information with violating Penal Code section 211 (robbery); he was alleged to have used a firearm during the commission of the offense. He was also charged in count II with violating Penal Code section 245 (assault with a deadly weapon). His challenge to the composition of the San Bernardino County petit jury panel was denied; his motion under Penal Code section 1538.5 was also denied. A jury found appellant guilty on count I of robbery in the second degree, but concluded he was not armed during the commission of the offense; he was found not guilty on the charge within count II. Appellant's application for probation was denied, and he was sentenced to state prison for the term prescribed by law. He now appeals from the judgment.

The facts may be quickly stated. Appellant, apparently armed, entered the Jolly Farms Restaurant in Fontana. Appellant gave a sack to a Mrs. Jo Stein, an employee of the restaurant and ordered her to fill it with money. The son of the restaurant owner noted appellant was wearing dark pants, a gray shirt, and a red hard hat. The robbery of the restaurant constituted the charge set out in count I.

Two days later, one Louis Quade arrived for work at the Mobile Lunch Catering Service. Apparently, because her suspicion was aroused, Mona Volk, secretary at the catering service, pointed out to Quade an old white Chrysler or Dodge with high tailfins and big tail lights, parked on the street. Quade and one Richard Pranausk tried to follow the vehicle in Quade's automobile in order to get the license number. They were only able, however, to read KCB, the first three letters of the license plate. While they were following the vehicle, Pranausk and Quade observed two puffs of smoke from the side of the car ahead. With the second puff, the windshield of Quade's automobile shattered. Pranausk identified appellant as the driver of the vehicle which he and Quade were following. The shooting incident constituted the basis of count II, on which the jury found appellant not guilty.

Several days later, Detective John Powell of the San Bernardino County Sheriff's office was investigating the shooting incident. In the course of his investigation, Detective Powell contacted Lynn Reese, the manager of the Red Wing Motel. Powell and Reese proceeded to room 2, and knocked at the door. Hearing no answer, Reese unlocked the door, and Powell entered the room; at that time, Powell had not obtained a search warrant. In the room Powell found two construction safety helmets. A stakeout was set up

to observe the room, and Powell left to obtain a search warrant. Later in this opinion we set out the facts detailed in Detective Powell's affidavit in support of the search warrant, this in connection with appellant's contention the warrant was invalid.

A search of the motel room pursuant to the warrant uncovered twelve rounds of a .38 caliber ammunition, one red and one white construction safety helmet, a pair of gloves, a pair of blue slacks, a small amount of money, a vehicle purchase order dated October 25, 1970 in appellant's name for a Dodge 4-Door Sedan with the license number KCB 543, and a temporary license plate. Pursuant to the warrant, the police also seized the Dodge sedan. Appellant was subsequently arrested; the details of the arrest are not, however, in the record before us.

Appellant challenges the validity of the procedures used to select petit jury panels in San Bernardino County. He also contends the search warrant was invalid, both because it was tainted by Officer Powell's first allegedly unlawful entry, and because the affidavit upon which it rested was constitutionally insufficient. Finally, he asserts the prosecutor was guilty of prejudicial misconduct. As we shall explain, we conclude the petit jury selection procedures employed by San Bernardino County are constitutionally and statutorily valid. As we shall also explain, we conclude the warrant under which appellant's room was searched was not invalid. We also find no prejudicial misconduct on the part of the deputy district attorney at the trial.

Appellant first contends the San Bernardino County petit jury selection procedure is constitutionally invalid because jury panels are selected from lists of registered voters, and because voter lists do not provide a representative cross-section of the community. Appellant asserts he is "poor and black and transient," and those of the same standing are less likely to register to vote than others.

The American jury system requires an impartial jury drawn from a cross-section of the entire community; recognition must be given to the fact that eligible jurors may be found in every stratum of society. (*Thiel* v. *Southern Pacific Co.*, 328 U.S. 217 [90 L.Ed. 1181, 66 S.Ct. 984, 166 A.L.R. 1412]; *People* v. *Carter*, 56 Cal.2d 549, 569 [15 Cal.Rptr. 645, 364 P.2d 477]; *People* v. *White*, 43 Cal.2d 740, 754 [278 P.2d 9].)

A county may constitutionally use voter registration lists as a sole source for petit jury selection at least absent a showing use of such lists resulted in the "systematic exclusion of a 'cognizable group or class of qualified citizens' " or such voter registration lists were compiled in a dis-

criminatory manner. (*People* v. *Sirhan,* 7 Cal.3d 710, 749-750 [102 Cal. Rptr. 385, 497 P.2d 1121]; *People* v. *White, supra,* 43 Cal.2d 740, 749; *People* v. *Gibbs,* 12 Cal.App.3d 526, 539 [90 Cal.Rptr. 866]; *People* v. *Newton,* 8 Cal.App.3d 359, 389-390 [87 Cal.Rptr. 394]; *Gorin* v. *United States,* 313 F.2d 641, 644.) The use of voter registration lists also fulfills the statutory requirement of Code of Civil Procedure section 206. (*People* v. *Gibbs, supra.*)

Here appellant concedes he has failed to demonstrate the voter rolls of San Bernardino County do not fairly reflect a cross-section of the community. Our inquiry would normally end here, since appellant has not met the burden of proof required and his contention must fail. (*People* v. *Sirhan, supra,* 7 Cal.3d 710, 749-750; *People* v. *Gibbs, supra,* 12 Cal.App.3d 526, 539; *People* v. *Newton, supra,* 8 Cal.App.3d 359, 390; *Gorin* v. *United States, supra,* 313 F.2d 641, 644.) Appellant asserts, however, the burden of proof is too severe in light of his indigency and the difficulty of such proof.

Even accepting as true appellant's unsubstantiated assertion of indigency, we do not think the burden onerous. It does not require, as appellant seems to assume, "polls . . . of the San Bernardino County community and voters registrants [*sic*] to prove the disparity between voter rolls and the community as a whole." A comparison between readily available census statistics[1] and voter registration lists would seem to be a sufficient basis for a proper challenge to the petit jury selection procedures. (See *People* v. *Newton, supra,* 8 Cal.App.3d 359, 389-390.)

Apart from the issue of selection from voter registration lists, appellant also asserts, both on constitutional and statutory grounds, procedures employed by the San Bernardino County Jury Commissioner in selecting petit jury panels are improper.

The record demonstrates some 35,000 names are selected by random electronic procedures from the voter registration lists provided by the registrar of voters. The 35,000 names are chosen, however, based on voting precincts: the random electronic procedure selects one of every five or six names per precinct, rather than on a county-wide basis. The ultimate lot chosen thus is not random throughout the county but random by precinct,

[1]The San Bernardino County Planning Department is a repository of the United States Census record figures covering the census tracts of the county. These records are located in a building adjacent to the county courthouse. Records in the Planning Department also show numbers and distribution of minority groups in the county, both of Mexican-Americans and the black community. Maps are available at that office showing the distribution of minorities by census tract.

and accordingly distributes the ultimate names on the master petit jury list on a geographical basis throughout the county. After statutory exemptions have been granted to those who are entitled and request such exemption (Code Civ. Proc., §§ 198-200), the number remaining for petit jury service is some 15,000. From this ultimate number, names are drawn by random electronic selection to fill the jury rolls.

Two hundred and forty-six prospective jurors are then placed in each jury impanelment, and one new impanelment becomes available for call each week; each impanelment is, however, subject to call for 12 weeks. Each impanelment is placed with the previously activated impanelments, and juries are chosen from the total group thus created.

The foregoing selection procedures are limited, however, by one final fact: except in capital cases, or where directed by the judge, jurors are selected who reside within a 25-mile radius of the court.

We may pass quickly appellant's contention the major part of the jury selection procedures fails to comport with statutory or constitutional requirements. With the exception noted below, the procedures employed meet the statutory directives of Code of Civil Procedure sections 198-199, 201 and 204 et seq. The use of random electric selection is authorized by Code of Civil Procedure section 255. The procedures are also, on their face, constitutionally valid. The final step of the selection process, that of failing to summon those otherwise eligible jurors who live more than 25 miles from the courthouse, however, presents some difficulty.

As we noted above, the record demonstrates the practice of the San Bernardino County Superior Court Coordinator is to automatically exclude from consideration for jury service those otherwise eligible residents of the county who live more than 25 miles from the courthouse.[2]

[2]"Q (By appellant's counsel): . . . I am referring to what I have heard express [*sic.*] as a county wide jury for certain types of cases. Do you have such a list?

"A (By Billie Ann Hansen, Chief Clerk, Superior Court Coordinator): We have jurors in our active list that live outside of the immediate valley area, and we normally would not summon some one from Needles for a case, unless we were directed to.

"Q And on what type of case are you directed to summon people from Needles?

"A We have not. Sometimes we have, perhaps, had a capital case where there was a death penalty involved. This would be at the request of the judge.

"Q Now, so that other than a capital case you would summon some one closer to the courthouse?

"A Yes.

"Q What is the general area that is excluded from all but capital cases?

"A We would try and keep it within 25 miles, I would say, proximity.

"Q Just for the record, that would exclude the town of Victorville?

"A Yes, sir.

"Q Which I suppose is some 30 miles away. That would take in Redlands?

Although appellant has cited no case, our independent research has disclosed several considering the question whether a geographical discrimination, unrelated to any other classifying factor, violates the constitutional requirement that "the jury be a body truly representative of the community." (*Smith* v. *Texas,* 311 U.S. 128, 130 [85 L.Ed. 84, 86, 61 S.Ct. 164].)

In *Thiel* v. *Southern Pacific Co., supra,* 328 U.S. 217, a case arising from California, the Supreme Court noted: "The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. [Citations omitted.] This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and *geographical* groups of the community; frequently such complete representation would be impossible. *But it does mean that prospective jurors shall be selected by court officials without*

"A Yes.
"Q But it would include Yucaipa?
"A Yes.
"Q But Calle Mesa [*sic.* Calimesa]?
"A Yes.
"Q It does include Calle Mesa [*sic.*], but it would not include 29 Palms?
"A No.
"Q Or Barstow?
"A No.
"Q Or Corona [*sic.* We take judicial notice of the geographic fact that Corona is located in Riverside County]?
"A No.
"Q Do you know the approximate size of the county?
"A Population wise?
"Q No. Area.
"A Not per square mile. It goes from Nevada, and around Needles is the farthest point.
"Q About 200 miles to the Nevada border, or the Arizona border, rather?
"A I really couldn't say.
"Q I don't know whether it would be 200 miles square more or less from San Bernardino County, but it would be within the southwestern corner?
"A I would think it would be close to that, but I coudn't say for sure.
"Q At any rate, at no time is there a jury wheel which contains all of the names of the jury list. Now, the jury list that I am referring to is the one signed by the judges, and at no time is the entire list in a jury wheel, and from those names in that wheel the actual panel which comes into the trial court [*sic.*] selected?
"A Yes.
"Q Is there any other designation between capital cases and other cases? That is, you have told us that there is a geographical list designation within 25 miles of the courthouse for all cases, other than capital cases?
"A Approximately.
"Q Are there any others?
"A As far as jurors?
"Q Yes.
"A No, sir."

*systematic and intentional exclusion of any of these groups.* Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury." (Italics added.) (328 U.S. 217 at p. 220 [90 L.Ed. at pp. 1184-1185].)

While we recognize *Thiel* rests on the Supreme Court's supervisory power over the federal courts, and the inclusion of "geographical groups" within the list of forbidden discrimination was only dictum, *Thiel* is nevertheless a case in support of appellant's position. Despite the court's reliance upon its supervisory power over the federal courts, the cases upon which the decision was based, *Glasser* v. *United States,* 315 U.S. 60 [86 L.Ed. 680, 62 S.Ct. 457] and *Smith* v. *Texas, supra,* 311 U.S. 128, are constitutional decisions. In California, *Thiel* has been taken as embodying a statement of constitutional principle. (*People* v. *White, supra,* 43 Cal.2d 740, 749-754; see *People* v. *Carter, supra,* 56 Cal.2d 549, 568-569; *People* v. *Gibbs, supra,* 12 Cal.App.3d 526, 539.) The federal courts have also taken the *Thiel* statement as a constitutional expression. (See e.g., *Brooks* v. *Beto,* 366 F.2d 1, 11-12; *Labat* v. *Bennett,* 365 F.2d 698.)

Moreover, the exclusion of members of a specific geographical area partakes of some of the same inequities as the system excluding daily wage earners condemned in *Thiel.* After concluding the exclusion of daily wage earners was justified neither by California nor by federal law, the court noted: "Moreover, the general principles underlying proper jury selection clearly outlaw the exclusion practiced in this instance. Jury competence is not limited to those who earn their livelihood on other than a daily basis. One who is paid $3 a day may be as fully competent as one who is paid $30 a week or $300 a month. In other words, the pay period of a particular individual is completely irrelevant to his eligibility and capacity to serve as a juror. Wage earners, including those who are paid by the day, constitute a very substantial portion of the community, [footnote omitted] a portion that cannot be intentionally and systematically excluded in whole or in part without doing violence to the democratic nature of the jury system. Were we to sanction an exclusion of this nature we would encourage whatever desires those responsible for the selection of jury panels may have to discriminate against persons of low economic and social status. We would breathe life into any latent tendencies to establish the jury as the instrument of the economically and socially privileged. That we refuse to do.

"It is clear that a federal judge would be justified in excusing a daily wage earnei for whom jury service would entail an undue financial hardship. [Footnote omitted.] But that fact cannot support the complete exclusion of all daily wage earners regardless of whether there is actual hardship involved. Here there was no effort, no intention, to determine in advance which individual members of the daily wage earning class would suffer an undue hardship by serving on a jury at the rate of $4 a day. All were systematically and automatically excluded. In this connection it should be noted that the mere fact that a person earns more than $4 a day would not serve as an excuse. Jury service is a duty as well as a privilege of citizenship; it is a duty that cannot be shirked on a plea of inconvenience or decreased earning power. Only when the financial embarrassment is such as to impose a real burden and hardship does a valid excuse of this nature appear. Thus a blanket exclusion of all daily wage earners, however well-intentioned and however justified by prior actions of trial judges, must be counted among those tendencies which undermine and weaken the institution of jury trial. 'That the motives influencing such tendencies may be of the best must not blind us to the dangers of allowing any encroachment whatsoever on this essential right. Steps innocently taken may, one by one, lead to the irretrievable impairment of substantial liberties.' *Glasser* v. *United States, supra,* 86."

The exclusion of those otherwise qualified citizens who live more than 25 miles from the courthouse also involves the disqualification of citizens for factors irrelevant to their eligibility and capacity to serve as jurors; although the record does not show a precise number of citizens involved, the exclusion here described includes the major part of the land area of San Bernardino County. We take judicial notice (Evid. Code, § 452, subd. (g)) that San Bernardino County encompasses 20,117 square miles, and is not only the largest county in California but also in the United States.[3] (World Almanac, 1972.)

However, we judicially notice the area from which jurors are drawn in ordinary cases encompasses most of the heavily populated areas of the county. The desert area lying north and east of the San Bernardino mountain range, which is largely excluded, is sparsely settled compared to the portion of the county within a radius of 25 miles from the courthouse. Less than 18 percent of the county's total population reside outside the 25-mile area.[4]

[3]Certain Alaskan "election districts" are larger in area; the 1972 edition of the World Almanac does not classify these entities as "counties."

[4]At oral argument counsel stipulated we might take judicial notice of the 1970 United States census tract figures for San Bernardino County. These figures show a

As a matter of constitutional imperative, however, we cannot say the geographical exclusion is invalid, absent a concomitant showing it discriminates against a particular racial, social or economic class. It may well be, however, under special circumstances, a geographical limitation which acts to eliminate a disproportionate number of a particular social, economic, or racial group is constitutionally invalid. In *Alvarado* v. *State* (Alaska 486 P.2d 891, the Alaska Supreme Court invalidated the practice of a judicial district choosing all prospective jurors from an area within a 15-mile radius of Anchorage. The defendant, however, was an Aleut native, and had lived the major portion of his life in an Aleut village. The record dramatically demonstrated the profound differences between the native culture and the Anchorage urban community; the Alaska court noted differences in ". . . occupation, economy, domestic relations, politics, language . . . race, cultural heritage and geography." (486 P.2d at p. 899.) The court emphasized the geographical limitation resulted in the disproportionate exclusion of native Alaskans as a specific, identifiable racial class.

The case before us involves no such exclusion. Appellant has made no showing the 25-mile geographical limitation disproportionately excludes any specifically identifiable racial, social or economic class. In this sense, the case before us differs markedly from *Thiel* v. *Southern Pacific Co., supra,* 328 U.S. 217. While experience tells us attitudes may differ along lines of education, sex, age, race and social and economic class, we are not aware they normally differ along lines respecting place of residence within a county. Although the geographical limitation might have some significance if it divided the county into rural and urban districts, appellant has offered no statistics showing those excluded might think or react differently from those included on matters which might be submitted to them as jurors. (Cf. *United States* v. *Butera,* 420 F.2d 564, 571-572; *United States* v. *DiTommaso,* 405 F.2d 385, 391-392.) We thus conclude the exclusion here involved is not constitutionally invalid.

The question whether the automatic geographical exclusion comports with the California statutory procedure of jury selection is, however, a different question. Code of Civil Procedure, section 201 specifies: "A

total county population of 682,233. The population of the valley area, south and west of the San Bernardino mountains had a population in 1970 of 545,483. All of the valley area lies within a radius of 25 miles from the courthouse. The mountain areas immediately adjacent to the valley had a 1970 population of 20,374; most of this area, also, is within a radius of 25 miles from the courthouse. The vast desert area, encompassing approximately 17,000 square miles, is almost totally more than 25 miles from the courthouse; it had a 1970 population of 116,376. Thus, approximately 565,857 out of a total population of 682,233, or some 82.9 percent, of all its people live within the 25-mile radius of the San Bernardino County courthouse.

juror shall not be excused by a court for slight or trivial causes, or for hardship, or for inconvenience to said juror's business, but only when material injury or destruction to said juror's property or of property entrusted to said juror is threatened, or when said juror's health, or when the health or proper care of said juror's own family, or when the sickness or death of a member of said juror's family make it necessary for said juror to be excused." The judge of the superior court or a majority of the judges thereof in any county may adopt written rules and regulations supplementary to such rules as may be adopted by the Judicial Council establishing a procedure whereby the jury commissioner may be empowered to grant excuses from jury service to such prospective jurors who in the opinion of the jury commissioner qualify for excuses under section 201. (Code Civ. Proc., § 201a.)

Code of Civil Procedure section 200 contemplates a decision individual to each prospective juror whether the hardship which he would suffer as a result of jury duty is unduly excessive. In this connection, we note jury service is a financial hardship to many people. But "[j]ury service is a duty as well as a privilege of citizenship; it is a duty that cannot be shirked on a plea of inconvenience or decreased earning power. Only when the financial embarrassment is such as to impose a real burden and hardship does a valid excuse of this nature appear." (*Thiel* v. *Southern Pacific Co., supra,* 328 U.S. 217, 224 [90 L.Ed. 1181, 1187].)

The ground of financial hardship is the only basis offered to support the geographical limitation here under attack. As the Attorney General suggests in his brief, "[t]he reason [the excluded citizens] are not summoned is because of the great distance involved in travel and the inconvenience to them." While, ideally, individualized circumstances should be preferred over blanket geographical exemptions, nevertheless an area of practical discretion must be left in the hands of judges and jury commissioners who select the jury list. To impose precise geographical standards of jury selection applicable to all counties large and small would create practical difficulties and greatly obstruct the usual and ordinary task of selecting jurors.[5] Differences in size of counties, variation in population

[5]We point out the great differences in the area and population of the six counties which comprise our Fourth Appellate District: (Using 1970 census figures)

| | sq. miles | population |
|---|---|---|
| Imperial | 4,241 | 74,492 |
| Inyo | 10,130 | 15,571 |
| Orange | 782 | 1,420,386 |
| Riverside | 7,176 | 459,074 |
| San Bernardino | 20,117 | 682,233 |
| San Diego | 4,261 | 1,357,854 |

densities, geographical barriers, travel distances, and other factors might make a rule proper in one county unworkable in another. A cross-section of the general population of San Bernardino County comprising more than 82 percent of all voters in the county was employed from which the trial jurors were ultimately chosen. Appellant has presented no showing of any prejudice suffered as a result of the methods of jury selection which were followed. Under the special circumstances existing, we conclude that although the exact statutory language for exclusion from jury service was not followed, the petit jury panel as constituted was valid in this instance. The appellant, as any defendant on trial in a criminal case, was also in a position to challenge individual jurors for good cause and peremptorily.[6] To reverse this case on the basis of the challenge propounded would, as Mr. Justice Frankfurter put it in his dissent in *Thiel* v. *Southern Pacific Co., supra,* 328 U.S. 217, 234 [90 L.Ed. 1181, 1192] remind one of ". . . burning the barn in order to roast the pig."

We next consider appellant's further contentions pertaining to the invalidity of the search warrant.

As we have pointed out above, Officer Powell entered appellant's motel room without a warrant and observed certain items. The officer then obtained a search warrant, and under the warrant seized a number of items. Appellant contends the initial search was illegal, and the warrant subsequently obtained was therefore invalid. The Attorney General concedes the initial entry was illegal. (See *Krauss* v. *Superior Court,* 5 Cal.3d 418, 422 [96 Cal.Rptr. 455, 487 P.2d 1023].)

It does not follow, however, the evidence seized under the warrant must necessarily be suppressed. "The appropriate question to be answered is ' "whether, granting establishment of the primary illegality, the evidence to

San Bernardino County is larger in area than the total area of 24 of the smaller counties of the state.

All the counties in the Fourth Appellate District, except Orange, are larger than one to nine other states in area. San Diego and Orange each also exceed 15 states in population. The differences between these contiguous counties are thus great in population and area. Geographical dissimilarities are also well known. Mountain ranges act as barriers to surface travel. There are major variances between desert, mountain, valley and shore regions. Individual counties may have several zones of difference. These demonstrate great divergence in population density, agricultural and industrial development, resort and recreation differences. In fact, individual counties in this appellate district differ almost as widely as some which are greatly separated within the State of California itself.

[6]Appellant exercised six peremptory challenges at trial. He was entitled to 10 peremptory challenges under Penal Code section 1070. There was no showing appellant was prejudiced by the absence of any person living beyond the 25-mile radius as a juror.

which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." ' " (*Krauss* v. *Superior Court, supra,* 5 Cal.3d 418, 422, quoting *Wong Sun* v. *United States,* 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407].) There was no exploitation of the illegal entry here.

Prior to the search of the motel room, Officer Powell had received information from Larry Volk that he had seen two Negroes acting suspiciously near his place of business; Volk provided a description of the men and their vehicle to Powell. Powell also knew Quade had followed the two men, had seen the letters KCB on the license plate of their vehicle, and then had two shots fired at him from the passenger's side of the vehicle.

Powell also knew an automobile had been found at the Red Wing Motel matching the description given by Volk, and bearing the license plate KCB 543. The vehicle bore a 3-4 inch mark on the right side at the rear of the back door, which appeared similar to a powder burn. Powell had also received word of a police radio report concerning the Jolly Farms Restaurant robbery; the vehicle found matched the description of the car used in that robbery, and the description of the men involved matched the description which Powell had received from Volk. After talking with the motel manager, Powell learned appellant was the only Negro male staying at the motel, he was staying in room 2, and the vehicle at the motel belonged to him.

The information just detailed formed the basis of Powell's affidavit in support of the search warrant; the information was lawfully obtained. The information obtained as a result of the illegal entry was unmentioned in the affidavit. The magistrate's independent decision to issue the warrant was in no way tainted by the officer's illegal entry and observations, because the magistrate was wholly unaware of the entry and observations. Although the observations may have contributed to Officer Powell's decision to seek a search warrant, the illegal search was not thereby exploited within the meaning of *Wong Sun.* (*Krauss* v. *Superior Court, supra,* 5 Cal.3d 418, 423.) On this point, *United States* v. *Bailey,* 458 F.2d 408, cited by appellant, is entirely inapposite.

Appellant also asserts, however, the warrant was constitutionally invalid on its face. The contention was not raised before trial, and may not be urged for the first time on appeal. Although appellant did challenge the evidence seized under the warrant on the ground the warrant was impermissibly tainted by Officer Powell's prior illegal entry, no objection was voiced on the ground raised here, that the affidavit in support of the warrant

was constitutionally insufficient under *Spinelli* v. *United States,* 393 U.S. 410 [21 L.Ed.2d 637, 89 S.Ct. 584], and *People* v. *Sesslin,* 68 Cal.2d 418 [67 Cal.Rptr. 409, 439 P.2d 321]. A judgment may not be reversed because of the erroneous admission of evidence illegally seized unless the record demonstrates a motion to exclude or strike the evidence was timely made, on the specific ground asserted on appeal. (Evid. Code, § 353; Pen. Code, § 1538.5, subd. (m).) An objection based on the insufficiency of the affidavit in support of the search warrant may not be raised for the first time on appeal. (*People* v. *Moore,* 13 Cal.App.3d 424, 434 [91 Cal.Rptr. 538]; *People* v. *Levy,* 16 Cal.App.3d 327, 335-336 [94 Cal.Rptr. 25].)[7]

Appellant urges, however, the failure by his appointed trial counsel to properly object to the sufficiency of the affidavit deprived him of a "critical and successful defense" and accordingly demonstrated constitutionally inadequate representation. (See *People* v. *Ibarra,* 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) If in fact, the affidavit had been insufficient, appellant's contention would be troublesome.

The standards relating to the sufficiency of an affidavit in support of a search warrant have been often stated: if the information upon which the police act has been supplied by an informer, the affidavit must contain facts indicating the information thus supplied was based on the informant's personal knowledge, and must also indicate facts demonstrating the credibility or reliability of the informer. (See *Spinelli* v. *United States, supra,* 393 U.S. 410; *People* v. *Superior Court,* 6 Cal.3d 704, 711-712 [100 Cal. Rptr. 319, 493 P.2d 1183]; *People* v. *Sesslin, supra,* 68 Cal.2d 418.) Appellant's contention here does not directly attack the affidavit on either of the two *Spinelli* grounds, but rather on the basis the affidavit does not indicate how the affiant, Officer Powell, received his information. The affidavit clearly shows the *sources* of the information on which Officer Powell relied (cf. *People* v. *Sesslin, supra,* p. 425), but it does not demonstrate how the information was conveyed to the officer.

The affidavit specifies the information provided by Larry Volk was related to one Deputy Harper of the San Bernardino County Sheriff's office. The affidavit also notes the information provided by Louis Quade was related to the Fontana sheriff's department. Deputy Harper located appellant's vehicle; how he conveyed that information to Powell is not revealed

[7]Appellant cites *People* v. *Tillman,* 238 Cal.App.2d 134 [47 Cal.Rptr. 614], and *People* v. *Perez,* 189 Cal.App.2d 526 [11 Cal.Rptr. 456], as establishing a contrary rule. Both cases were decided, however, before the adoption of the new Evidence Code and before the enactment of Penal Code section 1538.5. Although at the time of their decision *Tillman* and *Perez* may have stated the proper rule respecting the necessity of making a timely and specific objection, they do not now retain their validity.

in the affidavit. The affidavit does not state whether Officer Powell had personally heard the Fontana Police Department radio report regarding the Jolly Farms Restaurant robbery. On these facts, appellant builds his contention the affidavit was insufficient. We disagree.

We accept as valid appellant's basic premise the affidavit must show how the affiant received his information. That premise is implicit in the requirement the affiant speak with personal knowledge, indicate the sources on which he bases his knowledge, and that the affidavit indicate sufficient facts for a determination of probable cause to be made by "a neutral and detached magistrate." (See *Giordenello* v. *United States,* 357 U.S. 480 [2 L.Ed.2d 1503, 78 S.Ct. 1245]; *Aguilar* v. *Texas,* 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509]; *People* v. *Sesslin, supra,* 68 Cal.2d 418, 422-425.) The clear import of the affidavit before us, however, is that Officer Powell received the separate pieces of information either from an officer to whom it had been first related, or from an officer who first discovered the information by his own investigative means, or from a police department which had received information of a robbery. The officer was entitled to rely on the information which he received through official channels, so long as the information was such as could have been relied upon by the original officers. (See *People* v. *Hogan,* 71 Cal.2d 888, 891 [80 Cal.Rptr. 28, 457 P.2d 868]; *People* v. *Gardner,* 252 Cal.App.2d 320, 325-326 [60 Cal.Rptr. 321].) The information was properly relied upon by the original officers, since the information derived from citizens whose reliability had not previously been tested, but who had been the victims of a robbery or an assault. (*People* v. *Hogan, supra,* pp. 890-891; *People* v. *Gardner, supra,* pp. 324-325.) Under these circumstances, we conclude the affidavit was constitutionally sufficient to afford a basis for the issuance of the search warrant. Since the affidavit is constitutionally sufficient, the failure of appellant's trial counsel to challenge it before trial did not result in constitutionally inadequate representation.

Finally, appellant contends certain misconduct of the district attorney was of such a prejudicial nature as to require reversal of the judgment.

The conduct of which appellant complains occurred in the closing argument of the prosecutor. One Stein had been a witness to the Jolly Farms Restaurant robbery, but had died before trial. In commenting on the testimony of Mrs. Stein, the prosecutor states: ". . . and from the wife's testimony, we're not sure why he died . . ." Appellant asserts the statement

implied he had somehow caused Stein's death.[8] The trial court did not rule on appellant's suggestion the comment was misconduct, but neither did appellant suggest the jury be admonished to disregard the comment. The episode was quickly passed over, and the prosecutor did not again make such a comment.

A calculated campaign to engender hostility against a party is misconduct. (*Love* v. *Wolf,* 226 Cal.App.2d 378 [38 Cal.Rptr. 183].) It is also misconduct for an attorney to refer to material not offered or admitted in evidence, or to suggest the existence of facts unsupportable by evidence (*Malkasian* v. *Irwin,* 61 Cal.2d 738, 747 [40 Cal.Rptr. 78, 394 P.2d 822]) or to allude to personal knowledge during his summation to the jury. (*Garden Grove School Dist.* v. *Hendler,* 63 Cal.2d 141, 143 [45 Cal.Rptr. 313, 403 P.2d 721].)

Even if we were to assume misconduct, reversal would not be justified. As set out in footnote 8, after the judge sustained appellant's objection to the argument, the matter was dropped and not mentioned again. No curative instruction was requested. We find no misconduct at the stage which had been reached in argument. While the argument was not proper it cannot be said the comments made it more likely appellant would be convicted. Thus, reversal is not required. (*People* v. *Beivelman,* 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913].)

Eyewitness testimony by two persons positively identified appellant as the robber. Thus, the incomplete comment which in itself carries little impact vis-à-vis the direct eyewitness testimony, would seem to lack significant prejudicial import. The evidence was markedly in support of the jury's determination. We cannot conclude the jury would have reached a different result absent the objectionable argument. The jury was instructed

---

[8]The prosecutor's comment was as follows:

"The man, if he had any problems in his mind, he could have stopped and settled them. And if he went that far, he could have come into this court and completely settled it.

"Now, putting words or actions or thoughts into the mind of a dead man—and from the wife's testimony, we're not sure why he died—

"MR. WEBB: I object to any inference. This is not a homicide case, and any inference as to why Mr. Stein died some seven months—six months after this event, I think it amounts to a misconduct.

"THE COURT: Counsel, you didn't intend to dwell on this point, did you?

"MR. EWART: No.

"MR. WEBB: I will, if necessary, your Honor. I think, very clearly, it was not so caused and should not be entered.

"THE COURT: All right, move on with the argument, sir.

"MR. EWART: Well, the only point I was going to say is that words have been placed in his mouth; and I mentioned that earlier, anticipating that."

it should not be influenced by sympathy, prejudice or passion; it was also instructed it should not consider as evidence any statement of counsel made during the trial.

The judgment is affirmed.

Kerrigan, J., and Tamura, J., concurred.