Filed 10/23/15  Cigana v. Moreau CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| STEPHANIE CIGANA, | B255230 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BD592858) |
| PHILIP MOREAU, | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Scott Gordon, Judge.  Affirmed in part, reversed in part, with directions.

Paul Kujawsky for Defendant and Appellant.

Law Offices of Jeffrey W. Doeringer and Jeffrey W. Doeringer for Plaintiff and Respondent.

_____

## INTRODUCTION

Appellant Philip Moreau appeals from a restraining order issued in favor of his wife, Stephanie Cigana, pursuant to the Domestic Violence Protection Act, Family Code section 6200 et seq. (the DVPA). Moreau also appeals from a custody order granting Cigana sole physical custody of the couple's daughter in connection with the DVPA restraining order. Moreau contends the trial court's evidentiary rulings and management of the evidentiary hearing deprived him of his right to due process. We conclude the court acted within its discretion and that the domestic violence restraining order and physical custody order are supported by the evidence.

Respondent Cigana challenges the legal custody order on the ground that the finding of domestic violence raised a mandatory rebuttable presumption against granting Moreau joint legal custody. (See Fam. Code, § 3044, subd. (a).) While the presumption is rebuttable, the statute requires the court to consider several enumerated factors before granting a domestic violence perpetrator sole or joint legal or physical custody. (*Id.*, subd. (b).) Because the record does not indicate whether the trial court considered these mandatory factors before granting Moreau joint legal custody, we will reverse the legal custody order and remand the matter to the trial court for the limited purpose of determining and setting forth findings as to whether Moreau should be granted joint legal custody under the factors set forth in Family Code section 3044, subdivision (b). In all other respects, the domestic violence restraining order and custody order are affirmed.

2

# FACTS[1] AND PROCEDURAL BACKGROUND

### 1. *Family Background*

Moreau and Cigana met in 1999 and married in 2004. Their daughter, Laetitia, was born in 2006. Moreau has a teenage daughter from a previous marriage, Kelly, who has lived with Moreau and Cigana on a half-time basis since 2009.

In 1994, Moreau founded Monaco Baking Company (Monaco Baking). In 2008, he gave Cigana half of his shares in the company. At the time of the events preceding the restraining order, Houdini Inc. (Houdini) owned 75 percent of Monaco Baking; Moreau and Cigana were minority shareholders and both worked for the company.

### 2. *Cigana's Request for a DVPA Restraining Order*

On November 6, 2013, Moreau and Cigana met with a representative from Houdini, Bill Shea, in Moreau's office. According to Shea, Moreau "berat[ed]" Cigana during the meeting over her management of Monaco Baking, until Cigana finally declared, " 'I can't do this anymore,' " and told Shea, " 'either he goes or I go.' " Cigana then turned to Moreau and said, " 'I want you out of the house. We're going to get a divorce.' " Shea testified that he previously observed Moreau lose his temper four or five times at work, during which Moreau had similarly berated and belittled other employees.

After Cigana left the room, Moreau turned to Shea and said, " 'This is why people buy guns and kill people.' " Shea reported Moreau's statement to Houdini's owner and the company's human resources department. Shea also called Cigana to warn her about what Moreau said. He made the reports because he was concerned for Cigana's safety and the safety of everyone at Monaco Baking.

---

[1]    We state the facts in the light most favorable to the trial court's order, resolving all conflicts and indulging all reasonable inferences in support of the court's ruling. (*In re Marriage of Rossi* (2001) 90 Cal.App.4th 34, 40; see *In re Marriage of Zimmerman* (1993) 16 Cal.App.4th 556, 561 [substantial evidence rule applies to trial court's implied factual findings, while resulting legal conclusions based on those findings are reviewed for abuse of discretion].)

Cigana returned to the meeting moments later, unaware of what Moreau had said, and verbally resigned from Monaco Baking. A few days later she submitted a written resignation. Shea took the resignation, but told Cigana he would hold it because he intended to convince her to stay. According to Shea, Moreau later told him, " 'You should keep [Cigana] and let me go.' " " '[Cigana] is very talented and she'll do a good job for you. It's time for me to move on.' " After Moreau refused to submit a written resignation, the board of directors terminated Moreau from his position as Monaco Baking's executive director. Cigana participated in the meeting, but abstained from the vote to terminate Moreau.

On November 22, 2013, Cigana returned from work to find Moreau in a very angry mood and somewhat drunk. He began criticizing Cigana, prompting her to lock herself in the bedroom to avoid another argument. Despite Cigana making it clear that she did not wish to speak with Moreau, he repeatedly came to the room to insult her, eventually using tools to unlock the door. Cigana retreated to the bathroom and locked the door, but Moreau continued to harass her by yelling through the door.

Moreau ultimately unlocked the bathroom door and forced himself in, this time "holding a small black axe in his right hand[] and another tool in his left hand," later identified as an awl. Though he never overtly threatened to kill Cigana, Moreau held the axe about a foot from her face, saying, " 'Now we're going to talk,' " or " 'Are you going to listen to me now?' " Cigana was terrified and rushed to find Laetitia, who Moreau had apparently instructed to lock herself in her room. When Laetitia heard Cigana at her door, she let her mother in. Cigana locked the door and called the police.

When the police arrived they were unable to find an axe. Absent a threat of violence, the police told Cigana the incident was merely a "domestic disturbance." The police did not prepare a report.

Though Cigana was shocked by Moreau's conduct and distressed by the police reaction, she was unwilling to leave the home without Laetitia. Moreau had told her he would accuse her of kidnapping if she left the home with their daughter. Cigana put Laetitia to bed and slept in her daughter's room that night with the door locked. Later,

4

Cigana bought a chain lock and safety bar to secure the guest bedroom, where she slept following the incident.

On December 5, 2013, Cigana came home from work to find Moreau in a bad mood. Realizing it was going to be "another difficult evening," Cigana turned on her cellular phone's microphone to record the anticipated dispute. As Moreau played with the couple's daughter, he made comments about how he was going to have Cigana's parents and brother put in jail and ruin Cigana financially. When Moreau eventually realized Cigana was recording the conversation, he became very angry. After he grabbed the phone and attempted to delete the recording, Moreau took the phone outside and dropped it in the jacuzzi. When Cigana attempted to retrieve the phone, Moreau reached into the jacuzzi, grabbed the phone, threw it on the ground and began stomping on it. Ultimately, Moreau took a hammer to the phone, smashing the glass until the phone was dead. Cigana grabbed Laetitia, locked herself and her daughter in the guestroom, secured the door with the safety bar, and called the police.

The police could not find the broken phone, but did interview Laetitia, who confirmed Cigana's account. The officers advised Cigana to get a restraining order and assisted her with gathering things so she and Laetitia could stay at a friend's house that night.

On December 6, 2013, Moreau and Cigana attended a parent-teacher conference at Laetitia's school. The teacher advised them that Laetitia had spoken to her about what occurred the night before. Though the teacher did not disclose the details of what Laetitia said, Moreau immediately started raising his voice, accusing Cigana of manipulating Laetitia. When Cigana attempted to leave the school in a separate car, Moreau used his car to block her exit. He then came to Cigana's window and said, " 'You want to know what's going to happen? I am going to ruin you. Ruin your family. Destroy you. And then when that's all over I will kill you. That's what's going to happen!' "

On December 6, 2013, the day of the parent teacher conference, Cigana filed a petition for dissolution of her marriage to Moreau.

On December 7, 2013, Cigana went to the family home to drop off Laetitia. Moreau began harassing Cigana as she attempted to gather clothing and personal items. While she was loading a bag of clothing into the trunk of her car, Moreau approached her. Moreau told Cigana he "wanted to make sure [she] was getting his new flyer" and showed her a printout of a nude photo of her. He told her it was "the photo-of-the-day," which he had sent to some of her coworkers.[2] When Kelly, Moreau's older daughter, came outside, Moreau crushed the paper and rushed into the house. He called through the door for Kelly to come inside, but she refused until he calmed down. Moreau continued to yell so loudly through the door that two neighbors stopped to ask if they should call the police.

On December 10, 2013, Cigana filed a request for a domestic violence restraining order against Moreau. The court issued a temporary restraining order and custody order in advance of a full evidentiary hearing. The custody order granted the parents joint legal and physical custody, and provided for Laetitia to spend weekdays with Cigana and all but the fifth weekend of the month with Moreau.

3.      *Evidentiary Hearing on the DVPA Restraining Order*

The three-day hearing on Cigana's restraining order request commenced on January 24, 2014. Moreau denied that he ever threatened Cigana, and his account of the foregoing confrontations was markedly different from the evidence Cigana presented.

Contrary to Shea's testimony concerning the November 6, 2013 incident, Moreau denied making the statement, " 'This is why people buy guns and kill people.' " According to Moreau, he said nothing to Shea after Cigana left the room, and he ran after Cigana to apologize for the argument. Moreau further maintained that the meeting had been orchestrated by Cigana and Shea to oust him from Monaco Baking. On cross-examination, Moreau's counsel questioned Shea about whether he and Cigana had been

---

[2]      As far as Cigana knows, Moreau did not actually send the picture to anyone.

in discussions for "at least a couple of months leading up to [the] incident on November 6, [about how] the two of you wanted [Moreau] out of the company." The court permitted Shea to answer the question over Cigana's counsel's objection. Shea denied having the discussion with Cigana.

Moreau's counsel pursued a similar line of questioning during his cross-examination of Cigana. Over her counsel's objection, the court permitted Moreau to elicit testimony from Cigana regarding her involvement in Moreau's termination from Monaco Baking. Cigana testified that she advised Moreau to take the separation package he had been offered, but she otherwise refused to involve herself in the separation negotiations and abstained from the vote to terminate Moreau. When Moreau's counsel asked Cigana to confirm she was the one "who wanted [Moreau] ousted from Monaco Baking," the court again overruled her counsel's objection. Consistent with Shea's testimony, Cigana testified that she resigned first, and it was only after Moreau decided to leave that she resolved to stay with the company.[3]

Moreau testified that Cigana's request for a restraining order was "an elaborate fabrication" to deprive him of his company. He attempted to bolster the assertion, in part, by questioning Cigana's father about an email he sent his daughter advising her to "set herself up as to appear to be the victim." Though the trial court questioned the relevance of the inquiry to the domestic violence restraining order, the court permitted Moreau to pursue it. Cigana's father testified that the advice related to Cigana's resignation and the fact that Monaco Baking was performing poorly financially; it had nothing to do with portraying herself as Moreau's victim.

---

[3] The court also permitted Moreau's counsel to elicit testimony from Cigana, over her counsel's objection, regarding a dispute Moreau had with Houdini concerning the couple's personal liability on a line of credit. Cigana confirmed that she sided with Houdini in the dispute.

Moreau also testified that Cigana lied about the December 5, 2013 incident involving her cellular phone, and suggested again that she instigated the incident as part of a conspiracy to oust him from Monaco Baking. According to Moreau, he did not smash the phone, but he did take it from Cigana because she had been using it to secretly record "information about what [Moreau] was going to do legally against the business and against her." In Moreau's version of events, Cigana surreptitiously placed the phone on the dining table to record him while he played with Laetitia, then she began "talking about the business," making "bizarre and provocative" comments, and "fishing for information to give to [his] partners." When he discovered he was being recorded, Moreau testified that he grabbed the phone and questioned Cigana about the recording, at which point Cigana attacked him, forcing him to flee to the outside deck where the jacuzzi was located. Moreau never said what he ultimately did with the phone.

Moreau denied holding an axe to Cigana's face and making death threats against her. Though he sent unsolicited pictures of Cigana in a bikini to Cigana's counsel, he denied that he had any nude photos of her. Moreau's evidence also included testimony from two of the couple's friends, who confirmed that they had never seen Moreau drunk and had no concerns about whether he was a good parent or dangerous to children.

4. *Custody and Summation Arguments*

After the parties completed their evidentiary presentations on the restraining order, the court asked them to meet and confer then submit their requests regarding custody. Cigana requested that Laetitia spend the weekdays with her and alternating weekends with each parent. Cigana based her request on the fact that she had moved to a residence very close to Laetitia's school, while Moreau continued to reside at the marital home, which was significantly farther away. Moreau requested a "3, 5, 5, 3" arrangement—the same custody arrangement he had for his daughter Kelly—under which Laetitia would spend two sets of weekdays and two sets of weekends a month with each parent. Moreau argued his request was reasonable in view of the fact that he was unemployed and thus had the ability to care for Laetitia during the day, while Cigana, in contrast, had assumed additional responsibilities at Monaco Baking. The court inquired about the distance from

8

Moreau's home to Laetitia's school, then asked for "[a]rgument on the whole thing," reiterating, "I don't need any further testimony. The whole thing."

Cigana's counsel focused on the several confrontations with Moreau that precipitated Cigana's filing of the restraining order petition and the evidence that corroborated her version of events. Moreau's counsel argued Cigana filed the petition to assist herself and Houdini in their business dispute with Moreau, citing the timing of the alleged incidents and the fact that Cigana continued to interact with Moreau even after he allegedly threatened her life. Counsel argued Cigana's conduct showed she did not have a "reasonable belief that she was being disturbed or assaulted" and that her charges of domestic violence were "simply a painted picture to try to gain an advantage in the collateral [business dispute]."

5. *The DVPA Restraining Order and Custody Order*

The court granted Cigana a two-year domestic violence restraining order and sole physical custody of Laetitia, with visitation for Moreau on the first, third and fifth weekends of each month. The court preserved its prior order for joint legal custody.

In its oral statement of decision, the court acknowledged that "[t]he parties are clearly in a business dispute" and "are intertwining [their] personal relationship within that." While the court recognized this raised "some interesting issues with regard to [Cigana's] credibility," it observed that the "strongest evidence with regard to [Moreau's] conduct" was his demeanor "during the course of the hearing," which included "him mocking, making mocking gestures at [Cigana], [and] rolling his eyes." The court characterized Moreau's conduct as "disturbing," noting it was consistent with the tone of inflammatory statements he made in emails to Cigana, and tended to corroborate the evidence of harassment and emotional instability on Moreau's part. In particular, the court found the evidence left no reason to doubt Shea's testimony concerning Moreau's "comments at the meeting with regard to getting a gun." Concluding with the observation that "[t]he purpose of the DVPA is to allow parties to go through the divorce process in a peaceful [and] safe manner," the court found the evidence sufficient to support Cigana's request for a restraining order.

9

## DISCUSSION

1. *The Court Did Not Abuse Its Discretion in Managing and Controlling the Evidentiary Hearing on the DVPA Restraining Order*

The DVPA's purpose "is to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (Fam. Code, § 6220.)  To achieve this purpose, the DVPA authorizes the court to issue an order enjoining a party from, among other things, "stalking, threatening, . . . harassing, . . . coming within a specified distance of, or disturbing the peace of the other party." (Fam. Code, § 6320.)

Several times during the hearing on Cigana's restraining order request, the trial court reminded the parties to keep the DVPA's purpose in mind and to direct their evidentiary presentations to issues relevant to this purpose, in order to make the best use of the court's limited time and resources.  On appeal, Moreau contends the court's efforts to focus the parties' presentations went too far and, in his case, "eliminate[d] [his] defense completely."  To support the assertion, Moreau quotes a handful of exchanges in which the court questioned how evidence related to the couple's business dealings with Monaco Baking and Houdini was relevant to the allegations underpinning Cigana's request for a DVPA restraining order.  Moreau argues the quoted passages confirm the court's "blinkered view of the case," and that by "refusing to consider the business-related evidence," the court deprived him of due process and committed per se reversible error.  Neither the law nor the record supports Moreau's contention.

Though "[t]he failure to accord a party litigant his constitutional right to due process is reversible per se" (*In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 293), not every ruling by a trial court that adversely affects a litigant's evidentiary presentation rises to the level of constitutional error.  On the contrary, the trial court unquestionably "has the power to rule on the admissibility of evidence, exclude proffered evidence that is deemed to be irrelevant, prejudicial or cumulative and expedite proceedings which, in the court's view, are dragging on too long without significantly

10

aiding the trier of fact." (*Id.* at p. 291.) It is only when the court abuses this discretion " 'in such manner as to prevent a full and fair opportunity to the parties to *present all competent, relevant, and material evidence* bearing upon any issue properly presented for determination' " that a litigant's due process rights are implicated. (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1357)

The trial court has broad authority and a statutory duty to control trial proceedings, including the introduction and exclusion of evidence. (Evid. Code, §§ 320, 352.) Evidence Code section 765 directs the trial court to "exercise reasonable control over the mode of interrogation of a witness so as to make interrogation as rapid, as distinct, and as effective for the ascertainment of the truth, as may be, and to protect the witness from undue harassment or embarrassment." Because the trial court has the power and the duty to exclude inadmissible, duplicative or unduly prejudicial evidence, "[i]t is well established that where questions are asked which are improper, the court acts within the scope of its duty in refusing to allow them to be answered, even though no objection [is] made. [Citations.]" (*People v. White* (1954) 43 Cal.2d 740, 747; see also *People v. Clark* (1992) 3 Cal.4th 41, 144.)

Far from establishing per se reversible error, many of the passages quoted by Moreau reflect the court's considered approach to its duty to control the trial proceedings and encourage the presentation of evidence that would best assist the court in its role as the trier of fact. In several of the passages cited, though the court raised questions about relevance, it nevertheless allowed Moreau's counsel to pursue his line of questioning, while admonishing counsel to make the best use of his time by keeping the DVPA's purpose in mind. In other instances when the court challenged the relevance of the testimony Moreau sought to elicit, Moreau's counsel simply withdrew the question rather than make an offer of proof. If counsel, as the proponent of the evidence, could not articulate why it would be relevant, there is no basis to claim the court acted in error. (See Evid. Code, § 354.)

11

Furthermore, contrary to Moreau's contention that the court's rulings "eliminate[d] [his] defense completely," our review of the record confirms that the court allowed Moreau wide latitude to prove his claim that Cigana fabricated the DVPA allegations purely to gain an advantage in the collateral business dispute. In several instances, as noted in our recitation of the evidence admitted at the hearing, the court overruled Cigana's objections, allowing Moreau to elicit testimony concerning, among other things, whether Shea and Cigana had discussions about ousting Moreau from Monaco Baking; Cigana's involvement in the separation negotiations and vote to terminate Moreau; Cigana's role in Moreau's dispute with Houdini over a line of credit; and Cigana's father's advice to "set herself up as to appear to be the victim" in tendering her resignation.

The problem for Moreau was not, as he claims, that "[t]he court refused to consider [his] evidence." Quite the contrary. The court considered Moreau's evidence, and grasped his defense theory. The problem for Moreau was that the court simply did not find his theory compelling in light of all the other evidence presented. In its oral statement of decision, the court acknowledged that "[t]he parties are clearly in a business dispute" and recognized that this raised "some interesting issues with regard to [Cigana's] credibility." But even setting aside questions about Cigana's credibility, the court found that Moreau's inflammatory email messages and other communications, coupled with his emotional and provocative demeanor at the hearing, left no reason to question Shea's testimony about Moreau's statement, " 'This is why people buy guns and kill people.' " That statement, together with the evidence cited by the trial court and the reasonable inferences the court could draw from the evidence, was more than sufficient to support the court's conclusion that a restraining order was warranted to prevent further acts of abuse and harassment. (Fam. Code, § 6220.) We conclude the court acted within its discretion and the DVPA restraining order was supported by the evidence.

2.     *The Custody Order Is Supported by Sufficient Evidence; Moreau Forfeited His Objection by Failing to Raise It with the Trial Court*

Early in the proceedings, the court signaled to the parties that the hearing would have two phases:  first, the DVPA restraining order; second custody and visitation.  As a practical matter, this phased approach is sensible, because a finding of domestic violence precludes application of the preference favoring frequent contact with both parents and creates a rebuttable presumption that an award of sole or joint physical or legal custody to the domestic violence perpetrator would be detrimental to the child's best interest.  (Fam. Code, § 3044, subd. (a).)  This presumption does not eliminate the best interest of the child analysis, which remains the central element of any initial custody determination.  (*Keith R. v. Superior Court* (2009) 174 Cal.App.4th 1047, 1051.)  The best interest analysis requires the court to consider evidence pertaining to the child's health, safety and welfare, the nature and contact with the parents, and any history of abuse by one parent against the child or other parent.  (Fam. Code, § 3011.)

Because the court instructed the parties to focus their evidentiary presentation on the DVPA restraining order during the initial phase of the hearing, and received only the parties' requests and arguments on custody, Moreau contends "there is no evidence to support the court's [custody] ruling."  Additionally, because the court instructed the parties that it "[did not] need any further testimony" prior to summation arguments, despite having thrice instructed them not to elicit testimony directly related to custody during the restraining order phase, Moreau contends the court deprived him of his right to due process.  Neither argument establishes reversible error.

Though it is true that the court directed the parties to limit their evidentiary presentations to the DVPA restraining order, it is not the case, as Moreau contends, that the court ruled on custody in "an evidentiary vacuum."  On the contrary, our review of the record confirms that the court received ample evidence during the restraining order phase to make a determination under Family Code section 3011 concerning Laetitia's best interests with respect to physical custody.  Among other things, that evidence showed that Moreau's irrational and harassing behavior had twice subjected Laetitia to

13

visits from the police, causing her in the most recent incident to disclose the troubles at home to her school teacher. The evidence also showed that Moreau continued to reside in the marital home, some 30 miles away from Laetitia's school, while Cigana had moved to the same town where her daughter's school was located. This evidence, which the court elicited from the parties in connection with discussing custody, also supported a reasonable inference that the weekday custody arrangement Moreau requested would not be in Laetitia's best interest.

As for Moreau's contention that the court's management of the proceedings deprived him of the opportunity to present direct evidence on the custody issue, we agree with Cigana that Moreau forfeited this objection by failing to raise it with the trial court. " 'An appellate court will ordinarily not consider procedural defects . . . in connection with relief sought or defenses asserted, where an objection could have been but was not presented to the lower court by some appropriate method.' " (*Doers v. Golden Gate Bridge etc. Dist*. (1979) 23 Cal.3d 180, 184-185, fn. 1.) Where the claimed error involves the exclusion of evidence, the complaining party generally must preserve the issue by making an appropriate objection and offer of proof. (Evid. Code, § 354, subd. (a).) A complaining party is relieved of this obligation, however, where the court's earlier rulings indicate an objection would be futile. (*Id.*, subd. (b).)

Moreau contends the court's admonitions during the DVPA restraining order phase, and its statement, "I don't need any further testimony," made absolutely clear that an objection would be futile. We disagree. The court's earlier admonitions all came during the restraining order phase of the hearing, but the court stipulated that it would receive direct evidence on custody once it had decided whether domestic violence occurred. When the court seemingly changed course after receiving the parties' custody requests, and asked for argument on "the whole thing," it plainly had determined that the evidence presented with respect to the restraining order was sufficient to make a ruling on custody as well. At that point it was incumbent upon Moreau to remind the court of its earlier stipulation and, if challenged, to make an offer of proof as to what new evidence he could present regarding custody. Had the offer of proof been compelling, and the

14

court nevertheless precluded the evidence notwithstanding its prior stipulation, we would be in a position to find an abuse of discretion. However, in view of the evidence supporting the court's custody ruling, and absent Moreau's offer of proof, we cannot assess whether a miscarriage of justice occurred. (See Evid. Code, § 354 ["A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice"].) Having failed to adequately preserve the issue, Moreau has not met his burden of establishing reversible error.

3. *The Court Failed to Make the Requisite Findings for Granting Joint Legal Custody*

Under Family Code section 3044, a finding of domestic violence creates a mandatory rebuttable presumption that an award of sole or joint physical or legal custody to the domestic violence perpetrator would be detrimental to the child's best interest. (See *In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1498 ["The presumption [under section 3044] is rebuttable, but the court *must* apply the presumption in any situation in which a finding of domestic violence has been made"].) In determining whether the presumption has been rebutted, the statute directs that the trial court "*shall* consider all of the . . . factors" enumerated in section 3044, subdivision (b). (Italics added.) Here, the court failed to indicate on the record whether it considered these mandatory factors before granting Moreau joint legal custody. Both parties agree this was an abuse of discretion. Accordingly, we will reverse the joint legal custody order and remand the matter to the trial court for the limited purpose of determining and setting forth findings as to whether Moreau should be granted joint legal custody under the factors set forth in section 3044, subdivision (b).

4. *Nothing in the Record Indicates the Court Was Influenced by the Excluded Audio Recording*

During her cross-examination of Moreau concerning the nude picture incident, Cigana's counsel sought to introduce an audiotape that Cigana recorded without Moreau's consent. Counsel offered the recording to impeach Moreau's testimony regarding statements he exchanged with his teenage daughter Kelly during the incident. After a separate hearing to assess the tape's admissibility, the court excluded it from evidence pursuant to Penal Code section 632, subdivisions (a) and (d) on the ground that Cigana recorded it without the consent of all parties to the communication.[4]

Notwithstanding the order excluding the tape, Moreau contends "[t]he court abused its discretion by relying on an illegal and inadmissible audio recording." (Boldface omitted.) Moreau premises his argument on the "impossibility of 'unringing the bell,' " stressing that the court twice reviewed a transcript of the recording before ruling on its admissibility. Contrary to the logic of Moreau's contention, our presumption of correctness dictates a different conclusion.

---

[4] Penal Code section 632, subdivision (a) prohibits the intentional recording of a "confidential communication" without the consent of all parties to the communication, and subdivision (d) precludes the admission into evidence of any recording made in violation of the statute in any judicial proceeding. As noted, the statute applies to "confidential communications," which are defined in Penal Code section 632, subdivision (c) to include "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, *but excludes a communication made in . . . any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded.*" (Italics added.) Though not necessary to our resolution of the claimed error, we question whether Penal Code section 632 applied to the subject recording in view of the statute's "confidential communication" requirement. The undisputed evidence, including testimony elicited by Moreau's counsel during the admissibility hearing, established that the subject communications occurred largely outside the home, and were so loud as to be overheard by passing neighbors who stopped to ask whether they should call the police.

The most fundamental rule of appellate review is that " '[a] judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

It is not enough for Moreau to simply argue that the trial court *must have erred* in view of the supposed "impossibility of 'unringing the bell.' " As the appellant, Moreau bears the burden of overcoming the presumption of correctness by presenting a record that affirmatively demonstrates the court erroneously and prejudicially relied on the excluded audiotape. While Moreau asks this court to indulge outside-the-record "empirical research" that suggests judges are "unable to suppress inconvenient knowledge" and broad assertions about the "normal range of humanity's intellectual powers to forget on command," he fails to cite anything in the record suggesting these sweeping generalities applied to the trial court in this case. On the contrary, Moreau admits "[t]here is no implication that the trial judge was anything but as conscientious and scrupulous as he could be." Enough said. Moreau has failed to establish reversible error with respect to the court's exclusion of the audiotape.

5. *The Denial of Moreau's New Trial Motion Is Not Reviewable on Appeal*

Cigana's counsel personally served Moreau with the DVPA restraining order on January 29, 2014. Moreau filed a notice of intention to move for new trial 40 days later, on March 10, 2014. The court concluded that Cigana's service of the restraining order constituted service of notice of entry of judgment under Code of Civil Procedure section 659, subdivision (a)(2), which started the 15-day jurisdictional time limit for Moreau to file his notice of intention to move for new trial. Because Moreau failed to file his notice of intention within the prescribed time, the court concluded it lacked jurisdiction to grant a new trial under Code of Civil Procedure section 660. Moreau contends this was error.

17

An order denying a motion for new trial is not independently appealable.  (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 19; see Code Civ. Proc., § 904.1.)  Although we may review such an order if it "involves the merits or necessarily affects the . . . order appealed from or . . . substantially affects the rights of a party" (Code Civ. Proc., § 906), that is not the case here.[5]

In this case, Moreau challenges the court's ruling on purely procedural grounds that have nothing to do with the merits of the appealable DVPA restraining order.  Nor does the ruling "substantially affect[]" his rights, as that phrase is to be understood in Code of Civil Procedure section 906.  "It is implicit within section 906's language that the 'intermediate' order or decision that substantially affects the rights of a party must be one that *led up to, or directly relates to, the judgment or order being appealed*."  (*Cahill v. San Diego Gas & Electric Co*. (2011) 194 Cal.App.4th 939, 948, italics added.)  The denial of Moreau's new trial motion for failure to file within the time prescribed by Code of Civil Procedure section 659 is both "substantively and[] procedurally collateral to" the DVPA restraining order from which he appeals.  (*Cahill,* at p. 948.)  The ruling is not subject to appellate review.  (*Ibid.*)

---

[5]     Because an appealable order is essential to appellate jurisdiction, we must consider the question of appealability sua sponte, and decline to review the order if it is nonappealable.  (*Harrington-Wisely v. State of California* (2007) 156 Cal.App.4th 1488, 1494; *Caruso v. Snap-Tite, Inc.* (1969) 275 Cal.App.2d 211, 213.)

18

## DISPOSITION

The joint legal custody order is reversed and the matter is remanded to the trial court with directions to determine and set forth its findings as to whether Moreau should be granted joint legal custody under the factors set forth in Family Code section 3044, subdivision (b). In all other respects the domestic violence restraining order and custody order are affirmed. Cigana is entitled to her costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


JONES, J.[*]

We concur:


EDMON, P. J.


ALDRICH, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.